## JASPER F. HAMMOND

v.

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 25, 1902.*

1. CRIMINAL LAW—*intent to murder is the gist of offense of assault to commit murder.* An indictment for an assault with intent to murder can only be sustained by proof that the accused made an attempt to kill the other party under such circumstances that had the attempt been successful the killing would have been murder, and not merely manslaughter or justifiable homicide.

2. SAME—*when instruction is improper.* If the evidence is conflicting as to whether the accused or the other party was the assailant, an instruction for the People is improper which assumes as an established fact that the accused was the assailant.

3. SAME—*intent to kill may not be intent to murder.* If one acts in self-defense he may intend, at the moment of firing the shot, to kill the other party and yet not be guilty of intent to commit murder.

4. SAME—*the law does not always imply malice from deliberate use of a deadly weapon.* A man may deliberately and intentionally use a deadly weapon in self-defense without the implication of malice.

5. SAME—*inability to "escape" not essential to the right of self-defense.* One unlawfully assaulted and put in apparent danger of his life or great bodily harm need not attempt to escape, but may repel force with force, even to the taking of his assailant's life, if necessary, or apparently so, to prevent bodily harm.

6. SAME—*jury should be left free to determine the facts where the evidence is close.* If the evidence on a trial for assault with intent to commit murder is close, the jury should be left free to determine whether the accused, when firing the shots, though acting deliberately, was actuated by malice, or whether he was moved by motives of self-defense or from sudden heat of passion, engendered by a provocation sufficient to reduce a homicide from murder to manslaughter.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. L. D. PUTERBAUGH, Judge, presiding.

WHITMORE, BARNES & BOULWARE, for plaintiff in error:

In assault with intent to kill, specific intent is the gist of the offense, and it must be such an assault that if death ensues it is murder. Hughes on Crim. Law, sec.

191; *Hopkinson* v. *People*, 18 Ill. 264; *Crosby* v. *People*, 137 id. 336; *Dunn* v. *People*, 158 id. 589.

If the homicide, in case death had ensued, would have been but manslaughter, then the defendant could not be guilty of assault with intent to murder, but only simple assault and battery. Hughes on Crim. Law, sec. 192; *State* v. *Neal*, 37 Me. 468; *Maher* v. *People*, 10 Mich. 216; *Ex parte Brown*, 40 Fed. Rep. 81; *Elliot* v. *State*, 46 Ga. 159; *Hopkinson* v. *People*, 18 Ill. 264.

The law does not always imply malice from the deliberate and intentional use of a deadly weapon, nor is it always to be presumed where one person deliberately injures another. Such a rule of law would entirely ignore doctrine of self-defense. *Friederich* v. *People*, 147 Ill. 310.

Instructions not based on the evidence, tending to mislead the jury to the injury of the party against whom the verdict is rendered, will warrant a reversal of the judgment although correct as abstract propositions of law. *Healy* v. *People*, 163 Ill. 383; 11 Am. & Eng. Ency. of Law, 248; *Beaver* v. *Taylor*, 1 Wall. 637; *State* v. *Bailey*, 57 Mo. 131.

WILLIAM V. TEFFT, State's Attorney, and EDWIN HEDRICK, for the People:

If a person deliberately uses a deadly weapon upon another it must be inferred that it was malicious. *Friederich* v. *People*, 147 Ill. 310.

Threats and opprobrious words are not such considerable provocation as to justify an assault, unless accompanied by acts that created in the mind of the prisoner a reasonable apprehension that his life or body was in danger. *Steffy* v. *People*, 130 Ill. 98.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This writ of error brings before us the record of the conviction, in the circuit court of Peoria county, of the plaintiff in error of the crime of an assault upon one Joseph Dixon with intent to kill and murder the said Dixon, upon which judgment the plaintiff in error was sentenced

to be confined in the State penitentiary at Joliet for an indeterminate period.

The indictment contained three counts. In the first and second of the counts the crime charged was an assault with intent to commit murder. In the third count the charge was an assault with a deadly weapon with intent to inflict a bodily injury, without any considerable provocation and under circumstances showing an abandoned and malignant heart.

It appeared from the evidence that the plaintiff in error had married a sister of said. Dixon; that a decree of divorce had been awarded to Mrs. Hammond, and that the custody of the daughters, five in number, of the married couple, had been given to the wife and the custody of their only son given to the husband. The decree provided the plaintiff in error should be allowed to visit the children at the home of their mother twice a week within reasonable hours of the day, and that Mrs. Hammond should have the same privilege to visit their son at the home of the father. Soon after the rendition of the decree Dixon and the plaintiff in error had a fight, in which the plaintiff in error was overmatched and beaten, and it was proven he had said to one witness, "I have a gun, and if it comes up again I shall probably use it," and to another, "that Dixon had done him up once, and if there was a re-occurrence of the trouble he had got a pistol and would kill Dixon if he could." The plaintiff in error testified that he said, in substance, that if Dixon jumped on him again to whip him he would take care of himself, etc. Mrs. Hammond and her daughters resided with the prosecuting witness, Dixon, at his home on Adams street, in Peoria. The plaintiff in error lived on the same side of Adams street, a few blocks from the Dixon home. About seven o'clock on the evening of the 18th day of April, 1901, the plaintiff in error was walking up Adams street on his way home by the usual route, which led past Dixon's house. Dixon came out, and the affray which

led to the indictment and conviction of the plaintiff in error then occurred. The version of the occurrence given by the prosecuting witness was substantially as follows: "I had just got home from work in the evening. I looked out and saw Hammond come along in front. He was talking to the (his) children. I heard him say, 'You need not get so God damned gay about it.' I stepped out on the front porch and told him to stop his swearing. He said he was not swearing. I walked down to the front, where Hammond was. He asked me if he could not talk to his own children without me interfering. I told him yes, but he would have to act the man. I told him he could not come around there and raise a disturbance or go about the neighborhood talking about the women. I asked him what he had been telling Nelson about my mother and sisters. He said, 'Nothing.' I told him if he had I would punch his face for him right there. He started off and walked about ten feet. I supposed he was going to leave. I was in the act of turning to go into the house, and he drawed out a gun and said, 'You God damned son-of-a-bitch, if it is trouble you are looking for, trouble you can have,' and just as I started toward him he fired, and I just got hold of the muzzle of the revolver when he fired the second time. When I got to him I got hold of the gun and I struck at him. I struck him three or four times. I think I knocked him down. I still had hold of the gun. After I got him down I took the gun in my right hand and started choking him with my left. I had the gun very near out of his hands when Mr. Fisher and my sister, Mrs. Hammond, came out. They took the gun out of my hands. Fisher throwed his arms around my neck and throwed me off Hammond, backward. Then Harris came and arrested us. We were then taken to patrol box. On the way there he said several times he was sorry his aim was bad. Neither of the shots hit me." On cross-examination he stated he told the plaintiff in error if he (plaintiff in error) "had said such things to Nelson I would

punch his face for him. Then he called me a God damned son-of-a-bitch, and pulled out his revolver and told me if it was trouble I was looking for it was trouble I could have, and he told me he would go with me and face Nelson, and I told him I did not want to go then. I told him that whenever I met him he always looked like he wanted to jump right on me and give me a thumping. I told him he would stand and look at me like he wanted to jump on me and pound me." Dixon also testified: "Hammond had not spoken to me before I came out and spoke to him."

The substance of the testimony of the plaintiff in error as a witness was: "I went down the street alone. I was going home. As I came across the street going down between Sanger street and the Dixon residence there is a vacant lot or room for a building in the Dixon yard. As I came to the fence that divided this yard I saw my oldest daughter, and the baby was trying to run away from her. She picked the baby up. She did not see me as I came and stood eight or ten seconds, and hollowed, 'Hello! Pud.' That is a nickname I used to have for her. She did not hear me, and I said again, 'Hello! Pud.' I don't remember whether she saw me or not. She went in the house with the child. I started down the street, and as I got down a little past the walk where the steps go into the yard Mr. Dixon came to the door and said something. I had not seen Dixon before he came to the door. I said, 'Was you speaking to me?' He spoke again, and I did not understand him either time, and I said, 'I didn't understand you.' Then he walked down about half way from the house to this brick wall, and he says, 'You are around here cussing and swearing, ain't you?' I said, 'I didn't hear anybody swearing or cursing; I hollowed 'Hello' at Pearl, and if that is swearing then I must have sworn.' He said, 'Well, I thought you did.' I said, 'You are mistaken.' Then he went on and told me a lot of stuff that Mr. Nelson told him. I told him that certain things were not true; there were some of

199—12

them I did not say. He said, 'Well, if I was satisfied that you said that, I would just mash your face right here for you.' I said, 'I will tell you, Joe, I will go with you to Mr. Nelson; whenever it is convenient for you I will make it convenient for me.' By this time he had walked up to me. After I told him that I would go with him to Nelson's he says, 'Well, I don't want you to disgrace Pearl by speaking to her any more.' I said, 'I am not asking you nor any other damned man whether I can speak to my own children.' He says, 'Well, every time you see me on the street you are always making eyes at me.' I said, 'Dixon, I want nothing to do with you,' and I turned around and started down the street. Dixon says, 'You dirty cur, I will get you,' and jumped off this walk and he came at me. By the walk I mean the wall. I told him to keep away—that I did not want anything to do with him. He says, 'You dirty cur, I will get you.' Then I pulled out a gun and fired. I shot over his head, in the air. We clinched. He was scuffling for the gun and so was I. He took a couple of soaks at me and was trying to get the gun and I was trying to prevent him from getting it. I got knocked down and he got on top of me and was choking me. We were not very far apart when the first shot was fired. Dixon was out on the sidewalk. I was backing away from him and he was following me up. He came toward me in a very threatening manner and told me, 'You dirty cur, I will get you.' I shot to keep him away from me. I didn't want anything to do with him, and many a time I have walked out of my way when I have seen him there, in order to keep from meeting him.''

The affray was witnessed by Mrs. Hammond, Joseph Eaton, Burt Urton and Ella Archdale, whose testimony, on the whole, tended to corroborate the version given by the prosecuting witness, and by Thomas Carter, Minnie Brandenburg, August Reinman and Christov Reinman, whose testimony tended to support the version of the plaintiff in error, particularly to the effect that Dixon

was advancing on the plaintiff in error before the first shot from the revolver was fired, and some of these witnesses thought the men had clinched and were scuffling when the first shot was fired.

We thus refer to the testimony, not for the purpose of discussing it, but to show the state of the evidence required that the jury should have been accurately instructed as to the legal principles involved in the determination of the guilt or innocence of the defendant of the charge of an assault with intent to murder. Every homicide is not necessarily murder. It may be manslaughter, or the killing be justifiable as in necessary self-defense, and be no offense at all. The charge in the indictment of an assault to commit murder could only be sustained by proof that the plaintiff in error made an attempt to kill Dixon under such circumstances that had the attempt been successful the killing would have been murder. An intent to commit murder is the gist of the offense of an assault to commit murder, and it must be such an assault as, if death had ensued, the party charged would have been guilty of the crime of murder. (*Hopkinson* v. *People*, 18 Ill. 264; *Crosby* v. *People*, 137 id. 325; *Dunn* v. *People*, 158 id. 586.) Instructions Nos. 3 and 4 given in behalf of the People read as follows:

3. "It is not necessary to constitute an intent to murder that the party charged shall have brooded over it or have entertained it for any considerable time. It is sufficient if at the instant of the assault he intended to kill the party assaulted, or it will be enough if he is actuated, in making the assault, by that wanton and reckless disregard of human life that denotes malice, and the assault is likely to kill.

4. "The law implies malice from the deliberate and intentional use of a deadly weapon. Malice is always presumed where one person deliberately injures another."

We think these instructions ought not have been given. The phraseology of instruction No. 3 is such that

the jury could hardly fail to receive the impression that the court regarded the plaintiff in error as the assailant. The instruction seems to proceed upon that as an established fact. The state of the proof upon that question demanded that the minds of the jurors should have been left free to act on the evidence and determine for themselves who was the assailant. Nor is it true, as stated in this instruction, that it is sufficient to constitute an intent to murder that the party charged intended, at the instant of the assault, to kill the party assaulted. If Dixon was the assailant and the plaintiff in error was acting in self-defense in firing the shot or shots, though he shot with intent to kill, yet the law would not infer that he was actuated with an intent to murder. If the plaintiff in error, at the time of firing the shot, was not in good faith acting in self-defense but was actuated by a malicious intent to murder Dixon, then it was immaterial whether he had formed the murderous intent previously and brooded over it, or that he formed the intent at the instant of firing the shot; but that he intended, when he fired the shot, to kill Dixon is not sufficient to establish that the intent was malicious and murderous, for that would be to say he could not intentionally take the life of Dixon in self-defense without being guilty of murder. One may in self-defense intentionally kill another and not be guilty of murder. The doctrine of the instruction is incompatible with the law of self-defense. Furthermore, an intent to kill may be formed upon a sudden heat of passion arising from a provocation which, in law, would be sufficient to make the killing but manslaughter, and if, in such case, death did not ensue, the party charged with an assault to murder could not be convicted of that crime. An intent to kill may not be an intent to commit murder, but to take the life of another in self-defense or upon that sudden heat of passion which reduces the crime of killing to manslaughter.

Nor does the law always imply malice from the deliberate and intentional use of a deadly weapon, as the jury were advised by instruction No. 4. Malice aforethought is incompatible with the taking of human life in self-defense, yet a man may deliberately and intentionally use a deadly weapon to protect himself, in self-defense. In *Friederich* v. *People*, 147 Ill. 310, the trial court instructed the jury that "the use of a deadly weapon in making an assault will be presumed to be with felonious and malicious intent unless a different intent be proved," and in condemning the instruction it was said (p. 315): "Malicious intent is a necessary element of the crime of assault with intent to commit murder, for if the killing would have been less than murder if death had resulted, the act cannot be deemed an assault with intent to commit murder. Malicious intent must therefore be proved. It is true that it need not be done by direct testimony, and may, under certain circumstances attending the act, be presumed, but not from the mere fact that a deadly weapon was used. * * * This instruction entirely ignores the circumstances under which the weapon was used. It unqualifiedly attaches to the 'use of a deadly weapon in making an assault' the presumption of a felonious and malicious intent, whether deliberately used or upon a sudden heat of passion. * * * This instruction authorized the jury to find the felonious intent whether so done or not. It throws into the scale, against the defendant, a presumption which the law did not authorize." It was for the jury to determine, upon consideration of all the evidence, whether in firing the shots the plaintiff in error, though he deliberately and intentionally used a deadly weapon, was actuated with a malicious intent to murder Dixon, or whether, even though he intended to kill, he was moved to do so from motives of self-defense or from a sudden heat of passion engendered by a provocation of the kind and character which, in law, operates to reduce a homicide from murder to manslaughter.

Instruction No. 10 given in behalf of the People may have operated to mislead the jury. It reads as follows:

"The court instructs the jury that no words of provocation or threats whatever by witness Joseph Dixon would justify an assault, if any, by the defendant, Jasper Hammond, if said words or threats were unaccompanied by any acts of the said Joseph Dixon that would cause a reasonable and prudent man to believe that his life was in danger or that he was about to receive great bodily harm, and that he could not escape therefrom without taking the life of the said Joseph Dixon or doing him great bodily injury."

The ancient doctrine of the common law that the right of self-defense did not arise until every effort to escape, even to retreating until an impassable wall or something of that nature had been reached, has been supplanted in America by the doctrine that a man, if unlawfully assaulted in a place where he has a right to be, and put in danger, real or reasonably apparent, of losing his life or receiving great bodily harm, is not required to endeavor to escape from his assailant, but may stand his ground and repel force with force, even to the taking of the life of his assailant, if necessary or in good reason apparently necessary for the preservation of his own life or to protect himself from receiving great bodily harm. (2 Wharton on Crim. Law, sec. 1019; *Baird* v. *United States,* 158 U. S. 550.) The word "escape," as a verb, according to Mr. Webster, may mean "to flee from;" "to get out of the way of;" "to hasten away," etc.; and as a noun, "the act of fleeing from danger," etc. It is not necessary to the right of self-defense that the party having otherwise the right to exercise it cannot "escape" the danger by fleeing from an assailant.

We may here appropriately notice an error which resulted from the refusal of the court to give the following instruction asked by the plaintiff in error:

"An assault with intent to kill may be defined as an attempt made by one person upon the life of another under such circumstances that if the attempt so made should result in the death of the person assaulted the person committing the assault would be guilty of deliberate murder, and to sustain a conviction under such a charge the proof of such facts must be made to the exclusion of every reasonable doubt in the minds of the jury, otherwise you must acquit of that charge."

The circumstances attendant upon a homicide may be such that the act is neither justifiable nor excusable and still not be murder,—that is, it may have been under such provocation and heat of passion that the killing amounted only to manslaughter. If the circumstances are such that if death ensued the killing would only be manslaughter, the assailant, if death did not ensue, could not be guilty of an assault with intent to murder. (*Hopkinson* v. *People, supra; Crosby* v. *People, supra.*) It was the province of the jury to settle the conflict in the evidence and determine from the attending facts and circumstances whether the defendant acted in self-defense, or whether, if not in self-defense, the circumstances of the assault were such that had Dixon been killed the killing would have been murder or manslaughter or justifiable homicide. If his plea of self-defense should be found good he should be acquitted; if not good, he may be found guilty of an assault to commit murder, to do a bodily injury or a simple assault.

The errors in advising the jury as to the rules of law applicable to the facts disclosed by the evidence may have operated to produce the verdict and judgment of conviction of an assault with intent to murder. The judgment must therefore be reversed, and the cause will be remanded for such further proceedings as to law and justice shall appertain.    *Reversed and remanded.*