(No. 27161.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MERWYN TILLMAN, Plaintiff in Error.

*Opinion filed September 21, 1943.*

DAVID J. MADDOX, (EMMET F. BYRNE, and CLYDE C. FISHER, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, of counsel,) for the People.

Mr. CHIEF JUSTICE SMITH delivered the opinion of the court:

On a trial by jury, in the criminal court of Cook county, plaintiff in error, Merwyn Tillman, was found guilty of the murder of Frank Hubbard. After· overruling various motions for a new trial and in arrest of judgment the court entered judgment on the verdict. Plaintiff in error was sentenced to the penitentiary for a term of twenty years, in accordance with the verdict of the jury. He has sued out the writ of error in this case to review that judgment. The errors assigned are the insufficiency of the evidence and that the verdict was the result of passion and prejudice, as evidenced by the term of imprisonment fixed by the jury.

It is the contention of plaintiff in error that on account of previous difficulties between them, one Nathaniel Byrd had threatened and assaulted him on several occasions. He further contends that Byrd and some of his associates had followed him and threatened his life. The evidence tends to show that prior to the fatal shooting, plaintiff in error had been associating with Byrd's wife, from whom Byrd was separated but not divorced. Plaintiff in error knew this. The difficulties between Byrd and plaintiff in error, prior to the shooting of Hubbard, obviously grew out of plaintiff in error's clandestine associations with Mrs. Byrd. The previous attacks on him, alleged by plaintiff in error to have been made by Byrd, occurred when plaintiff in error was in the company of Byrd's wife, or leaving her apartment. Plaintiff in error claims that because of these previous attacks and threats against his life by Byrd, he was justified in believing that he had been "marked"

by Byrd and his associates, and that they were seeking an opportunity to kill him. He does not claim that any attacks upon, or threats against, him, were made by Hubbard. He only associates the deceased with these alleged attacks and threats because he testified that the deceased was the constant companion of Byrd. While there is some controversy in the testimony concerning the previous difficulties, there is little dispute as to the facts surrounding the actual killing of Hubbard.

In the view we take of the case, the facts surrounding the killing, as stated by plaintiff in error when he was first arrested and in his testimony as a witness on the trial, may be accepted as true. Another eyewitness to the killing was a friend of plaintiff in error who was a passenger in his car. He gave substantially the same version of the transaction as plaintiff in error. The only other eyewitness to the shooting, called as a witness, was a pedestrian who was standing on the sidewalk nearby. He testified that when plaintiff in error got out of his own car and started toward the car occupied by Hubbard, he had the pistol in his hand.

The killing occurred on February 20, 1940, at the intersection of Fifty-fifth street with Michigan boulevard, in the city of Chicago. It occurred at about 10:00 o'clock P. M. Immediately following the fatal shooting, plaintiff in error left the scene. He concealed himself at the home of his father and at other places in the city of Chicago for some two days after the shooting. He then, in company with Byrd's wife, left Chicago by bus. They first stopped in Omaha, Nebraska. From there they went to Glenwood, Iowa, where they stayed for several days at the home of the grandparents of plaintiff in error. From there they went to Tulsa, Oklahoma, where some of Mrs. Byrd's relatives resided. Shortly before Christmas in 1940, Myrtle Byrd became ill. She returned to Chicago and spent some time in the county hospital there. In the spring

of 1941 she returned to Tulsa, where, some three weeks later, she died. Plaintiff in error, after the death of Mrytle Byrd, quit his job in Tulsa and returned to the home of his relatives in Glenwood, Iowa. He remained there until October, 1941. He then returned to Chicago where he remained only a few days. He next went to Detroit where he stayed for two weeks. He then returned to Chicago where he obtained employment at the stockyards. He was arrested on April 12, 1942, charged with the murder of Frank Hubbard on February 20, 1940.

On the day following his arrest, plaintiff in error signed a written statement, concerning the killing of Hubbard. This statement was admitted in evidence without objection. In this statement he detailed the facts preceding the killing. He stated that on February 20, 1940, at about 8:30 P. M. he parked his automobile at 4931 Indiana avenue. He further stated that at about 9:15 P. M. he returned to his car and found the windows broken and a dent in the top of the hood; that he later took a cab to Fifty-fifth street and Michigan boulevard. When he got out of the cab at the southwest corner of that intersection, he saw Byrd's car coming north on Michigan; that he got into the Byrd car as it passed him; that there was only one man in the car; that when he saw that Byrd was not in the car he asked the driver where Byrd was; that the driver turned in the driver's seat and that he thought he was searching for something when plaintiff in error shot him; that he did not know Hubbard, who was the driver of the car, personally, but had seen him with Byrd on prior occasions.

In his testimony on the trial he gave a slightly different version of the occurrence. He testified that he had known the deceased for about a year before the shooting; that on the night of February 20, 1940, he saw the deceased and Byrd together at Fifty-fourth street and Prairie avenue; that plaintiff in error was driving his own car. Accom-

panying him in the car was Myrtle Byrd; that he parked his car in front of a place of business on Michigan boulevard; that he left the car for the purpose of transacting some business; that Mrs. Byrd remained in the car; that when he returned to his car Mrs. Byrd told him that Byrd and Hubbard had just passed; that as they passed they said to her that they were going to get her and plaintiff in error, both; that she locked the door of the automobile, closed the window and sounded the horn for plaintiff in error; that this was about 8:30; that he got in the car and then went on about his business of collecting policy tickets and distributing drawings at various places; that when he left the last place where he made a business call, he saw the deceased on Michigan boulevard; that Mrs. Byrd screamed and said, "There is Frank;" that the deceased was driving Byrd's car at that time on Michigan boulevard, between Fifty-fifth and Fifty-sixth streets; that the car driven by the deceased moved up to the left of the car of plaintiff in error, and crowded him into the curb; that they both stopped because the crossing light had changed; that plaintiff in error got out of his car and went around to Hubbard in the other car; that plaintiff in error asked Hubbard "what this called for;" that he then walked around to the other side of the car and Hubbard said, "We get you" and, "He know'd he'd get us yet;" that Hubbard then struck the plaintiff in error in the face with his fist; that Hubbard then reached down in the car as if reaching for something; that plaintiff in error "was kind of dazed;" that he then drew the pistol out of his pocket and fired the shot; that the pistol was given to him by Mrytle Byrd before he left his car; that after he fired the shot he got back in his own car and left the scene. He went to his home at 4559 Evans avenue and then to his father's home where he spent two days in hiding before he left for Omaha, as already indicated. The fact

that Hubbard died six days later from the result of this shot, is not in dispute.

Plaintiff in error contends, upon these facts, that his life had been jeopardized by Byrd and his associates, including Hubbard; that he fired the shot in self-defense and to save his own life. Disregarding all the other evidence in the case, and accepting the versions of plaintiff in error, as given in his statement to the police and in his testimony, this contention is wholly lacking in support. He admits that at the time of the shooting he left his own car and went over to the car which Hubbard was driving; that he sought and brought on the difficulty; that he was armed with a deadly weapon. If, after he reached the deceased who was sitting under the wheel of the automobile which he was driving, plaintiff in error really, and in good faith, was put in fear of losing his life or receiving great bodily harm, he had every opportunity to discontinue the difficulty, notwithstanding all he stated was true. If, in fact, he found himself, as he claims, in a position of peril, it was brought about by his own aggressive conduct in seeking the difficulty. He cannot now be heard to say that he fired in self-defense.

Section 149 of division I of the Criminal Code provides that if a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given. (Ill. Rev. Stat. 1941, chap. 38, par. 367.) Threats of personal injuries or even against the life of another will not justify the latter in taking the life of the person who has made such threats, when he is doing nothing to put them into execution. (*Gilmore* v.

*People,* 124 Ill. 380.) A person who seeks and brings on an assault and who, when he finds the person assaulted is armed and ready to defend himself, produces a weapon and kills him, cannot escape the consequences of the killing by setting up a claim of self-defense. *People* v. *Grosenheider,* 266 Ill. 324.

Plaintiff in error further contends that the court erred in overruling his motions for a new trial. The verdict was returned by the jury on August 12, 1942. On August 14, 1942, he filed a motion for a new trial. This motion contained nothing except an argument on the facts. On August 31, 1942, he filed an additional motion for a new trial. In this motion he asked for a new trial on the ground of newly discovered evidence. To the motion he attached his own affidavit, and the affidavits of George Brown and Lloyd Walker. In these affidavits certain facts were set out which it was alleged would be testified to by Brown and Walker if a new trial was granted. These affidavits were prepared in the form of questions and answers set out at length.

On September 15, 1942, he filed an amendment to his previous motions for a new trial. In this amendment he attempted to show diligence in not procuring the testimony of Brown at the trial. He also made some reference to the testimony of one Agnes Broussard. He did not, however, set out what the testimony of Agnes Broussard would be, but simply alleged that it was material and would show that the pistol used belonged to Myrtle Byrd and that Myrtle Byrd had threatened to kill the "Nate" boy, and anyone with him, because of abusive treatment they had given her; that her separation from Nathaniel Byrd was because of his cruel treatment to her and her desire to be with other men, and not because of any act or conduct of plaintiff in error. This amendment was not sworn to. The court considered the motions for new trial and the

amendment as one motion. The motions were overruled and judgment entered on the verdict.

The affidavits of Brown and Walker attached to the motion for a new trial, and in which is found the alleged newly discovered evidence, related to difficulties occurring between plaintiff in error and Nathaniel Byrd and the deceased prior to the time of the shooting, and also conversations between these witnesses and the wife of Byrd. There were no new facts set up in either of these affidavits. They were merely cumulative and related to the same facts testified to by plaintiff in error and other witnesses on the trial. They are not conclusive. They are not, in our opinion, such that it can be said that they would likely change the result on another trial.

Applications for new trials on the ground of newly discovered testimony are not regarded with favor by courts and will be closely scrutinized. To justify a new trial the newly discovered testimony must be conclusive and not merely cumulative. (*People* v. *Mindeman,* 318 Ill. 157; *People* v. *LeMorte,* 289 Ill. 11.) The burden is on the applicant for a new trial on the ground of newly discovered evidence to rebut the presumption that the verdict is correct. It must appear to be of such conclusive character that it will probably change the result if a new trial is granted. *People* v. *Buzan,* 351 Ill. 610; *People* v. *Petrilli,* 344 Ill. 416; *People* v. *Dabney,* 315 Ill. 320; *People* v. *Pennell,* 315 Ill. 124; *People* v. *LeMorte,* 289 Ill. 11; *People* v. *Johnson,* 286 Ill. 108; *People* v. *Williams,* 242 Ill. 197; *Henry* v. *People,* 198 Ill. 162.

The affidavits relating to the newly discovered evidence do not meet this requirement. The punishment fixed by the jury was justified by the evidence. The record does not support the contention that the verdict was the result of passion or prejudice on the part of the jury. On the contrary the testimony of plaintiff in error, alone, would

have warranted the jury in inflicting a more severe penalty. The court did not err in overruling the motions for a new trial.

In this case it is admitted that plaintiff in error fired the shot which killed the deceased. He immediately fled from the scene and was a fugitive for more than two years. We have considered the case in this opinion only in connection with the testimony of plaintiff in error. There was other evidence in the record tending to establish his guilt, to which we have not referred. Giving to plaintiff in error everything he claims in his own testimony and in the alleged newly discovered evidence, the evidence was clearly sufficient to establish his guilt beyond a reasonable doubt. The weight of the evidence was a question for the jury. A judgment of conviction will not be reversed as unsupported by the evidence merely because there is a conflict in the testimony, but will be reversed only where the evidence is so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. (*People* v. *Martellaro,* 281 Ill. 300.) It has been said many times by this court that the law, whether wisely or unwisely, has entrusted the consideration and decision of the weight of the evidence to the jury and when the jury has honestly, according to the best lights before it, performed that duty, its determination must be accepted as conclusive, unless it is reasonably clear that errors have been committed. (*Henry* v. *People,* 198 Ill. 162.) There are no reversible errors in this record. The verdict and judgment of the court below are amply supported by the evidence and that judgment will not be disturbed by this court.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*