THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD ECHOLES, Defendant-Appellant.

First District (2nd Division) No. 61121

Opinion filed March 9, 1976.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, John T. Theis, and Edward V. Vienuzis, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Richard Echoles, was charged with aggravated battery and attempt murder of his wife, Gloria Echoles, and with murder for the homicide of his stepdaughter, Johnnethea Johnson. (Ill. Rev. Stat. 1971, ch. 38, pars. 12—4, 8—4, and 9—1(a)(1) and (2).) After a bench

trial, findings of guilty of attempt murder and voluntary manslaughter were made, judgment entered thereon, and concurrent sentences of from 6 to 18 years on each charge imposed. No specific findings were made on the aggravated battery charges; however, due to the sentence imposed on the greater charge of attempt murder, judgment of conviction and sentencing on the lesser and included offense of aggravated battery would be precluded. (*People v. Edgeston,* 9 Ill. App. 3d 880, 293 N.E.2d 344.) Defendant appeals from both convictions, arguing that the evidence adduced at trial was insufficient to establish his guilt of either offense beyond a reasonable doubt.

## I.

At trial, Gloria testified that she and defendant had maintained separate residences since 1966. On April 21, 1972, the date of the occurrence, Gloria lived with her daughter, Johnnethea (hereinafter referred to as "J.J."). J.J. was 20 years old and weighed approximately 124 pounds. At about 6 p.m. on this date, Gloria was entertaining several people at a dinner party in the basement recreation room of her building. During the party, she went to her first floor apartment where she observed defendant seated in her bedroom. It is disputed whether or not Gloria had given a key to defendant allowing him free access to her apartment. Defendant stated that he wished to talk with her, but she spurned his request. Gloria proceeded into the kitchen before returning to the basement. Defendant followed her to the basement where he remained for a few moments before departing.

Shortly thereafter, Gloria heard the doorbell ring and proceeded upstairs to the vestibule, but found no one at the door. As she turned, she observed defendant seated on the stairs leading to the second floor. Defendant asked to speak with her, but Gloria again declined. Gloria returned to her apartment to call her landlady, but defendant, who had a "shiny metal object" in his hand, "reached over [her] as if to cut the phone wires." However, she was able to complete the call. After ending her conversation, Gloria turned and defendant commenced striking her several times on her chest and shoulders. While the witness was attempting to defend herself, J.J. emerged from a bedroom and told defendant to leave her mother alone. Then, according to Gloria's testimony, defendant lunged at J.J. and struck her near her stomach. J.J. began bleeding and fell to the floor. Defendant then resumed his attack on Gloria, hitting her several times in the vicinity of her arms and head. She retaliated by grabbing some figurines from the table and throwing them at defendant. Defendant fled as some of the dinner guests came upstairs.

Throughout this incident, Gloria believed that defendant was using

his fist when striking both her and J.J. She further testified that she has several scars as a result of the fight.

On cross-examination, Gloria stated that when she told defendant, upon observing him sitting on the stairway, that she would not talk with him, he responded in a "forceful" manner that "if [Gloria] didn't talk to him, [she] wouldn't talk to anybody else." She also related that she did not shout obscenities at defendant before he started hitting her.

Two of the dinner guests were called by the prosecution to testify. Both witnesses had observed defendant in the basement on two brief occasions during the party. Shortly after defendant left the basement the second time, both heard screams coming from Gloria's apartment. They proceeded upstairs to the apartment and observed J.J. lying on the dining room floor covered with blood, and Gloria lying on the hall-way floor bleeding from her head and arms. One of the witnesses observed defendant leaving the apartment, and the other witness testified that she did not see any weapons in either the dining room, where the victims were lying, or in the living room.

Two Chicago police officers who arrived at the scene described the premises and the condition of the victims in a manner corroborative of the testimony of the two guests. Gloria related to the officers that she had been attacked by defendant.

A police officer for the City of Harvey arrested defendant on April 21, 1972. A search of defendant's car following his arrest revealed a small serrated steak knife in the glove compartment.

A pathologist with the Cook County Coroner's Office testified that on April 24, 1972, he performed an autopsy on the body of Johnnethea Johnson. He attributed the cause of her death to a stab wound in the femoral artery of her left thigh. He also testified that a weapon similar to the knife recovered from defendant's car could have been the weapon by which J.J.'s fatal wound was inflicted.

Defendant's landlady testified for the defense. On April 21, 1972, at approximately 8:30 p.m., defendant came to her apartment. He appeared excited, his jacket was torn, and he was bleeding from scratches on his face. Defendant related to the witness that he had had a "misunderstanding" with his wife. After unsuccessfully attempting to call his wife, defendant left the witness' apartment.

Defendant testified that, although he saw his wife often, they continued to live separately because they had frequent arguments. On April 21, 1972, defendant went to Gloria's apartment. Defendant's account of the events which transpired preceding the altercation was similar to Gloria's testimony; defendant made five requests to his wife

to discuss their marital difficulties, but Gloria refused each time because she was entertaining guests.

Defendant's testimony regarding the events subsequent to his encounter with Gloria in the vestibule diverges from Gloria's account of the situation. After Gloria reentered her apartment, defendant proceeded to the basement to place a telephone call. Although he did not complete the call, defendant did pick up the receiver and no one was on the line. Defendant returned upstairs and observed Gloria standing near the kitchen. Defendant testified that he did not have a knife in his possession, that Gloria had not informed him that she was going to call her landlady to request that the locks to her apartment be changed, that he did not attempt to cut the telephone wires, and that he did not tell Gloria that she would not talk to anyone else if she refused to talk to him. When Gloria again refused to talk to him, defendant became angry and grabbed Gloria by the arm, stating to her that they should sit down and discuss their problems. Gloria pulled out of defendant's grasp and "she came up with a knife." Defendant testified that Gloria used vulgar language and threatened to cut him if he did not leave her alone. A struggle ensued with defendant attempting to gain control of the knife. Gloria scratched defendant, and he hit her a few times. Although defendant never held the knife in his hand, he was not cut because he was able to control the hand in which Gloria held the knife. Shortly thereafter, J.J. came out of her bedroom and grabbed defendant by the shoulder. Defendant pushed J.J. away with his free hand. With Gloria still in front of him, defendant gave the following account of what occurred next:

> "And [J.J.] come up behind me and she tried to grab me again, and at that time I stumbled or tripped on the chair leg or table leg, whichever one it was, I can't remember, and at that time J.J. hollered. She said, 'Oh, momma,' and she fell up against the table."

Defendant was able to catch his balance and maintain his grip on Gloria's hand. After J.J. fell, defendant did not hit Gloria again. Defendant did not know whether Gloria was bleeding, but he did observe blood on J.J.'s nightgown near her hip. Defendant pushed Gloria aside and attempted to ascertain J.J.'s condition, but Gloria lunged at him with the knife. Since he no longer could control Gloria's actions with the knife, he left her apartment. As he was departing, Gloria threatened that she would kill him.

## II.

Defendant urges reversal of the conviction for attempt murder by contending that at the time of the altercation in which he was engaged

with his wife, he lacked the requisite mental state to commit murder. Rather, argues defendant, "the intent possessed by [him] was not to murder but, at most, to commit a voluntary manslaughter" as provided under either subsection (a) or (b) of section 9—2 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a) or (b)).[1]

■■ As statutorily defined, "A person commits an attempt when, *with intent to commit a specific offense,* he does any act which constitutes a substantial step toward the commission of that offense." (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 38, par. 8—4(a); *e.g., People v. Weeks,* 86 Ill. App. 2d 480, 230 N.E.2d 12.) It necessarily follows that "The charge of attempt to murder or attempted murder is composed of the elements of the attempt to kill coupled with the specific intent to commit murder." (*People v. Hammonds,* 12 Ill. App. 3d 340, 345, 297 N.E.2d 748, 751.) As a result, it is incumbent upon the prosecution when proving these elements to adduce evidence which would prove the accused guilty of murder, had a homicide been effected. (*People v. DeSavieu,* 14 Ill. App. 3d 912, 303 N.E.2d 782; see *People v. Herbert,* 340 Ill. 320, 172 N.E. 740; *People v. Browning,* 321 Ill. 559, 152 N.E. 552.) It is true, as is contended by defendant in the instant case, that an accused may

---

[1] The statutory definition of "voluntary manslaughter" is as follows:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

    (1) The individual killed, or

    (2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1971, ch. 38, par. 9—2).

The gist of defendant's argument is that he could have properly been found guilty of attempt voluntary manslaughter. Due to our disposition of this issue, we need not resolve our uncertainty as to the existence of such an offense in Illinois. It can be noted, however, that in *People v. Weeks,* 86 Ill. App. 2d 480, 485, 230 N.E.2d 12, 14, the court concluded the following: "Consequently, we agree that there can be no such crime as an Attempt to commit a Voluntary Manslaughter." The court's reasoning, however, was confined to an analysis of section 9—2(a). But see *People ex rel. Bassin v. Isreal,* 31 Ill. App. 3d 744, 335 N.E.2d 53, where the court affirmed the trial court's acceptance of the accused's negotiated plea of guilty of the offense of attempt voluntary manslaughter, while leaving for future adjudication the question of whether a set of circumstances could exist whereby the voluntary manslaughter statute, particularly section 9—2(b), could serve as a basis for the inchoate offense of attempt.

use a "weapon in a sudden heat of passion under circumstances that if killing resulted it would be [voluntary] manslaughter" (*People v. Osborne*, 278 Ill. 104, 114, 115 N.E. 890; 894; *Hammond v. People*, 199 Ill. 173, 64 N.E. 980), rather than murder.

Defendant presents two alternative theories intended to characterize his conduct during the altercation with Gloria as an "effort to commit a voluntary manslaughter." Under one theory, defendant maintains that he was "acting under a sudden and intense passion as a result of serious provocation generated by his wife * * *." This provocation was allegedly aroused by Gloria's refusal to talk to him in addition to her calling him "dirty names." Defendant concedes that the provocation which might result from an exchange of harsh words is legally insufficient to reduce the criminal responsibility for a homicide from murder to voluntary manslaughter. However, defendant argues that his anger which was created by Gloria's stubborn refusals and use of obscenities erupted and became a sudden and intense passion when she brandished a knife. Defendant cites and quotes from numerous cases in his reply brief as support for this position. We consider each of these cases to be distinguishable on their facts from the instant case.

■■ It can be noted initially that each case relied upon by defendant on this point involved a conviction for voluntary manslaughter, unlike the judgment of attempt murder of Gloria in the instant case. In each case, the reviewing court was able to find sufficient evidence of provocation contained in the record "upon which the [trier of fact] might find the defendant guilty of manslaughter" (*People v. Gajda*, 87 Ill. App. 2d 316, 321, 232 N.E.2d 49, 52), and hence an affirmance of the conviction was entered. (*People v. Pierce*, 52 Ill. 2d 7, 284 N.E.2d 279; *People v. Sain*, 384 Ill. 394, 51 N.E.2d 557 (reversed and remanded for proper sentencing); *People v. Binion*, 132 Ill. App. 2d 257, 267 N.E.2d 715; *People v. Newberry*, 127 Ill. App. 2d 322, 262 N.E.2d 282; *People v. Hough*, 102 Ill. App. 2d 287, 243 N.E.2d 520; *People v. Gajda*, 87 Ill. App. 2d 316, 232 N.E.2d 49; *People v. Stepheny*, 76 Ill. App. 2d 131, 221 N.E.2d 798.) These cases thus serve to illustrate the decisive role of the factfinder when a fatal act is variously contended to have been accidental or justified, as opposed to some form of felonious conduct. Therefore, aside from illustrating factual situations in which sufficient legal provocation to sustain a voluntary manslaughter conviction was found to have been present (because the provocation either aroused a sudden and intense passion in the defendant as a reasonable man or created in him a belief, albeit unreasonable, that the circumstances were such as to constitute legal justification for the killing), these cases lend no signifi-

cant support to defendant's position. As a court of review, we must ascertain whether the factual determination reached by the trier of fact was properly entertained, not whether a different finding could also be supported by the record.

Another distinguishing aspect of the cases relied upon by defendant is, moreover, that in nearly all of them either abusive language by the victim or a mutual quarrel of long duration was accompanied by an act of physical aggression by the deceased *prior* to the fatal attack by the accused. In the instant case, it is uncontroverted that defendant initiated the physical contact with Gloria. Gloria testified that she did not use abusive language, contrary to defendant's testimony, and that defendant began hitting her immediately after she completed a telephone conversation. Defendant stated that he grabbed Gloria's arm, although allegedly not for the purpose of commencing a fight. Their testimony with respect to the presence of a knife is conflicting. Although Gloria did not observe a knife in defendant's hand, she related that defendant struck her repeatedly, whereby numerous wounds were inflicted. She denied having a knife in her possession during the fight. Defendant testified that Gloria displayed a knife *after* he grabbed her arm and that a struggle for the knife then began. Even according to defendant's account of the incident, unlike the cases relied upon by him, some sort of physical activity was initiated by defendant prior to any act by Gloria which could possibly be construed as an act of physical aggression.

■■ The trial judge stated that he "could not ascertain who first had the knife." However, notwithstanding this uncertainty, defendant was found guilty of attempt murder "as charged in the indictment." Thus the trial court must have been persuaded by the testimony which tended to prove that defendant, "with intent to commit the offense of murder, intentionally and knowingly attempted to kill Gloria Echoles by stabbing Gloria Echoles with a knife, without lawful justification." We determine that this finding is supported by the evidence adduced at trial, and that defendant's guilt of attempt murder was established beyond a reasonable doubt.

■■ Based upon this finding entered by the trial court in light of its expressed uncertainty as to which party first displayed the knife, it is conceivable that the trial court believed a portion of the prosecution's case and a portion of defendant's testimony, which was the court's prerogative as the trier of fact. (*People v. Bereta,* 20 Ill. App. 3d 867, 314 N.E.2d 659.) When a jury is waived, the credibility of the witnesses, the weight to be accorded their testimony, and the inferences which may be drawn therefrom are within the determination of the trial court since it observed the witnesses testify. (*People v. Pride,* 16 Ill. 2d 82, 156 N.E.

2d 551.) Moreover, a conviction may rest upon the testimony of a single witness, if positive and credible, even though this testimony is contradicted by the accused. (*People v. Guido*, 25 Ill. 2d 204, 184 N.E.2d 858.) A reviewing court should not substitute its judgment for that of the trial court when the evidence is merely conflicting. *People v. Sain.*

When the facts of this case are considered in their aspect most favorable to defendant, the situation is similar to that which was presented to this court in *People v. Walker*, 22 Ill. App. 3d 711, 318 N.E.2d 111. In *Walker*, the accused testified to the following account of the altercation: defendant and the deceased became embroiled in an argument; the deceased attacked defendant with an iron, pulled a knife, and reached for a gun; during the ensuing struggle for the gun, three shots were fired, one of which proved fatal to the deceased; defendant discarded the gun, fled the scene, and subsequently returned; the following morning, no iron or knife was found by police at the scene of the altercation, but three empty cartridges were recovered. This evidence, in conjunction with the absence of powder burns on the deceased which would tend to disprove defendant's theory of accidental homicide, was held sufficient to establish defendant's guilt of murder beyond a reasonable doubt.

■■ In the instant case, testimony regarding an initial, knife-wielding attack by Gloria is less compelling than similar evidence adduced in *Walker*. Indeed, it is the improbability of defendant's version of the incident which is most apparent to us. (*People v. Myers*, 18 Ill. App. 3d 700, 310 N.E.2d 407.) Defendant's testimony paints a picture of two persons grappling for control of a knife with only an occasional punch being delivered. A review of the entire record, however, tends to quickly erase this picture, and an illustration of a struggle which is not so evenhanded is depicted. Defendant sustained a few scratches during the altercation, and his jacket was torn. In comparison, Gloria described several scars from wounds she received during the fight. Several other prosecution witnesses testified that Gloria's head and arm were "bleeding profusely." Another discrepancy between defendant's testimony and the evidence elicited from other witnesses is that defendant claimed that he fled the scene with Gloria swinging a knife at him and threatening him. However, no other witness observed a knife either in Gloria's possession or on the premises shortly after the fight had ended. In fact, a serrated knife was found in defendant's car which, according to the pathologist's testimony, was similar to the type of weapon which could have caused J.J.'s fatal wound.

■■ Furthermore, we do not agree with defendant's contention that the record fails to show that he possessed the requisite mental state to

commit murder. The intent with which an act is committed may be inferred from the act itself and from the surrounding circumstances, rendering the specific or express proof of such intent unnecessary. (*People v. Shields*, 6 Ill. 2d 200, 127 N.E.2d 440; *People v. Masterson*, 79 Ill. App. 2d 117, 223 N.E.2d 252.) We cannot say that the evidence is so palpably contrary to the trial court's finding that we entertain a reasonable doubt of defendant's guilt of attempt murder; we believe that the trial court could properly conclude either that defendant intended to·kill or do great bodily harm to his wife, or that defendant knew that his conduct created a strong probability that Gloria would die or suffer great bodily harm. Acting under one of these mental states, defendant repeatedly struck his wife. Hence, each element of the offense of attempt murder is satisfied by the evidence contained in this record.

The second theory by which defendant argues that his conduct could have been punished only as voluntary manslaughter, had a homicide occurred, is that he entertained an unreasonable belief that self-defense was necessary in order to protect himself from Gloria. (Ill. Rev. Stat. 1971, ch. 38, par. 7—1.) Defendant formulates this argument in the last two pages of his reply brief. We consider this position to be totally lacking in merit and deem additional discussion in this regard unnecessary.

## III.

With respect to the conviction for voluntary manslaughter, defendant presents a "murder-or-nothing" argument. Defendant summarizes his position as follows:

> "Thus, under the State's theory [defendant] was guilty of murder and under the defense theory [defendant] was guilty of nothing. Under no theory is he guilty of voluntary manslaughter."·

This theory is predicated upon the testimony of defendant and Gloria; no other witness who testified observed the altercation.

■■ In his brief, defendant properly cites the law which is applicable to his contention. If an accused is charged with murder but a trial on this charge·terminates in a conviction for voluntary manslaughter, this judgment has the effect of an acquittal of the graver charge and would bar a subsequent prosecution for murder arising out of the same facts. (*People v. Newman*, 360 Ill. 226, 195 N.E. 645; *People v. Liddell*, 353 Ill. 201, 187 N.E. 174; *People v. Clark*, 15 Ill. App. 3d 756, 305 N.E.2d 218.) Furthermore, notwithstanding the sufficiency of the evidence which would support a conviction for murder had the trier of fact so found, the record before a court of review must contain evidence which establishes the accused's guilt of voluntary manslaughter beyond a reasonable doubt:

"A trial court may convict for voluntary manslaughter on an indictment for murder, [only if] there is evidence to support the lower grade of homicide. \* \* \* And it is also true that if the evidence in such a case fails to support the finding of voluntary manslaughter, the conviction must be reversed outright and the defendant relieved of all jeopardy." (*People v. Adams,* 113 Ill. App. 2d 205, 216-17, 252 N.E.2d 35, 41.)

Thus, defendant asserts a position unlike that which he advanced at trial; defendant now concedes, at least arguendo, that there was sufficient evidence adduced at trial which might have supported a conviction for the murder of J.J., but he urges reversal of his conviction for voluntary manslaughter by claiming that there exists in the record a legally insufficient showing that he committed this lesser and included offense.

■■ We are in accord with defendant's position. After a careful review of the record and the applicable authorities, we have found no theory upon which defendant's conviction of voluntary manslaughter can be affirmed; "This is simply not a manslaughter case on any view of the facts." *People v. McMurry,* 64 Ill. App.2d 248, 252, 212 N.E.2d 7, 9.

In an attempt to encompass defendant's conduct by the statutory definition of voluntary manslaughter, the State presents two theories. First, it is argued that defendant's conduct falls within section 9—2(a):

"Although any provocation by the wife would have been insufficient in law to have reduced a hypothetical homicide of the wife to manslaughter \* \* \*, the added provocation by J.J.'s aggressive interference was 'the straw that broke the camel's back.'"

The second theory is as follows:

"The People submit that the trier of fact may well have concluded that the defendant saw that the tables were about to turn, that it was he who was now in danger, and that he then stabbed Ms. Johnson in an effort to save himself. Clearly, this act was not a justifiable homicide, but the circumstances furnished a basis for a finding of voluntary manslaughter under Ill. Rev. Stat. ch. 38, §9—2(b)."

We acknowledge that the two sections of the voluntary manslaughter definition attribute a different frame of mind to an accused. However, under the circumstances of this case, the two theories advanced by the State may be rejected by the same analysis.

Under any interpretation of the facts, J.J. was justified in coming to the defense of her mother. (Ill. Rev. Stat. 1971, ch. 38, par. 7—1.) A fight was in progress when J.J. emerged from her bedroom. The situation was such that J.J. could have reasonably believed that her mother

required assistance. When her request for defendant to leave her mother alone went unfulfilled, J.J. grabbed defendant's arm and then grabbed defendant from behind. It is uncontradicted that J. J. was unarmed. Consequently, J.J.'s use of force was both justified and reasonable under these circumstances.

■■■ An accused will not be heard to complain or assert self-defense when the perilous situation with which he was confronted arose out of his own aggressive conduct in seeking the difficulty. (See *People v. Tillman*, 383 Ill. 560, 50 N.E.2d 751; *Henry v. People*, 198 Ill. 162, 65 N.E. 120.) Any theory of provocation on these facts would be inconsistent with this principle. Indeed, an accused's felonious conduct should not be mitigated because an innocent bystander came to the defense of a person imperiled at the hands of the accused. In addition, this record will not support the contention that the "tables were about to turn," hence, further consideration of that theory is unnecessary.

Our holding on this issue should not be interpreted to mean that a conviction for voluntary manslaughter would never be proper when a third party meets his death after coming to the defense of a person under attack by the accused. The instant case was not a situation in which the third party used unlawful force in aid of a friend (*cf. People v. Johnson*, 4 Ill. App. 3d 249, 280 N.E.2d 764), or where the third party pursued the aggressor after the aggressor had abandoned the initial dispute with another (*cf. People v. Thornton*, 26 Ill. 2d 218, 186 N.E.2d 239), or where the accused's deadly assault on the third party was a separate and independent act from his initial attack on the person the third party attempted to help. Perhaps a conviction for voluntary manslaughter would be proper if the situation was similar to one of these.

## IV.

Accordingly, the circuit court's judgment of conviction of attempt murder is affirmed, and its judgment of conviction of voluntary manslaughter is reversed and the corresponding sentence vacated.

Affirmed in part and reversed in part and sentence vacated in part.

DOWNING and HAYES, JJ., concur.