THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN LEROY RUSSELL, Defendant-Appellant.

Fifth District  No. 5—89—0229

Opinion filed June 14, 1991.

Robert Agostinelli and Mark D. Fisher, both of State Appellate Defender's Office, of Ottawa, for appellant.

Gregory B. Grigsby, State's Attorney, of Taylorville (Kenneth R. Boyle, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

Defendant John Russell was charged with first-degree murder and unlawful use of weapons and was convicted of second-degree murder and unlawful use of weapons. He was sentenced to concurrent terms of imprisonment of 15 years and 364 days on the respective charges. No issues are raised on appeal on the unlawful weapons conviction. Four issues are raised by the defendant with regard to the second-degree murder conviction:

(1) whether the trial court erred in refusing to instruct the jury on self-defense;

(2) whether the trial court committed reversible error in allowing evidence that a car found near but not at the scene of the shooting contained guns and ammunition, some of which belonged to the defendant;

(3) whether the trial court committed reversible error in refusing to allow certain defense witnesses to testify concerning the victim's reputation for violence; and

(4) whether the defendant's 15-year sentence of imprisonment was excessive.

The defendant John Russell shot and killed his half-brother, Bob Coultas, on December 4, 1988. There is no dispute about the actual killing of the victim; there is, however, some dispute about the events leading up to the shooting.

The defendant lived in Tower Hill, Illinois, with his parents. He was a gun collector, and he kept his guns in a workshop on his parents' property. On November 27, 1988, the defendant noticed that seven guns were missing from his collection. He reported them stolen and also told the police that he thought Bob Coultas had taken them. According to the defendant, he had a good relationship with his half-brother prior to the theft, but Bob had developed a serious drug problem and did have a reputation for being violent when on drugs.

Two or three days after the theft, the defendant confronted the victim, told him that he wanted his guns back, and threatened to expose a drug ring involving a Dennis Conway and certain other of Bob's friends. Bob told the defendant that it was likely that he would be killed if he went to the police.

After the theft, defendant testified that he wore a bullet-proof vest most of the time. He also testified that he wore camouflage clothing most of the time even before the theft.

On December 3, 1988, the defendant received phone calls from Barb Coultas, who informed him that Bob had been released from jail and that she had the addresses of two people in Pana who had his guns. The defendant drove to Pana with David Coultas and Alberta Gatton, got the names and addresses from Barb Coultas, and then drove home, intending to give the names to the police on Monday.

The next evening, December 4, 1988, defendant received more information about who had his guns and information to the effect that Dennis Conway was in town and that they were in the back of Patty Langley's house loading up the guns. Danny Coultas drove defendant to Pana and dropped him off about a block away from the Langley residence. Defendant testified that he wanted to talk to Bob and tell him he would not go to the police and did not want to die because of a dispute over his guns. Defendant also stated that he wore a bullet-proof vest that evening and carried a gun because he knew that Bob's friends were dangerous. As defendant was walking from behind the Langley house toward the front yard, a station wagon pulled up and Bob Coultas and four others got out. A

man and a woman walked into the house and defendant approached Bob Coultas and the other two men, who turned out to be Conway and Nolan. Defendant said, "Put your hands up in the air where I can see them because I know you have weapons." Defendant testified that Bob started to turn to his right and defendant saw a gun in his hand. When Bob continued swinging the gun in defendant's direction, defendant raised his rifle and fired, killing Bob Coultas. Defendant told the other two, one of whom had pulled a gun, to put their hands up. One of the men threw his gun under the car and took a gun from Bob's body and tossed it under the car. Defendant then yelled for someone to call for an ambulance and the police.

When the police arrived, the defendant walked toward them from the southwest corner of the house with his hands in the air and told the police that he shot the victim. The police testified that they found no weapons on the person of Bob Coultas, but that they did find two guns underneath the car, which was about six to eight feet from where Bob was lying. One of the guns which they found had been reported stolen on November 27, 1988.

The police arrested defendant and a short time later arrested Danny Coultas, the victim's nephew, about a half-block away. Danny also wore a bullet-proof vest, and he had a pistol in his waistband. Danny's car was found parked at a car wash and when the police searched the car they found weapons and various types of ammunition. The defendant's pretrial motion to exclude the guns and ammunition found in Danny Coultas' car was denied.

The trial court refused to allow two of defendant's witnesses to testify as to the victim's reputation in the community for violence because neither of the witnesses knew or had spoken to anyone from Tower Hill, which is where the victim resided. Defendant's post-trial motion was denied, and he was sentenced to 15 years' imprisonment on the second-degree murder conviction.

The only issue which we address is the trial court's refusal to instruct on self-defense. We note at the outset that the jury believed, at the least, that the defendant had an unreasonable belief in the necessity of using force, since it returned a verdict of second-degree murder rather than a first-degree murder conviction as sought by the State. Secondly, there was evidence from the defendant that he believed that it was necessary to shoot his half-brother because he pulled a gun, turned toward him, and raised the gun. Some years ago our supreme court held that if evidence supports a self-defense instruction, it will also support a voluntary manslaughter instruction. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d

378.) *Lockett* has been followed since then. *People v. O'Neal* (1984), 104 Ill. 2d 399, 472 N.E.2d 441; *People v. Everette* (1990), 141 Ill. 2d 147, 565 N.E.2d 1295.

*Lockett* also pointed out:

> "It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that a jury could not find the defendant's subjective belief was unreasonable. So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable." *Lockett*, 82 Ill. 2d at 553, 413 N.E.2d at 382.

While *Lockett* required the giving of a voluntary manslaughter instruction if a self-defense instruction was given, and this case deals with the converse of that situation, the reasoning of *Lockett* is still persuasive in this situation. *People v. Timberson* (1989), 188 Ill. App. 3d 172, 544 N.E.2d 64; *People v. Woodward* (1979), 77 Ill. App. 3d 352, 395 N.E.2d 1203.

■ The State does not seriously contest the basic proposition that the jury should be instructed both as to self-defense and second-degree murder if evidence is produced that would establish a subjective belief in the use of force in the defendant's mind. The State's main contention is that the self-defense instruction should not have been given because the defendant was the initial aggressor. The trial court found that the defendant was the initial aggressor, and the State argues that the evidence supports the court's finding. The State relies upon the fact that the night before the shooting the defendant wore a bullet-proof vest, armed himself and another person, and went looking for the victim in hopes of retrieving his stolen guns. Although they did not find the victim on that night, the next night they went out again armed in a similar manner. The defendant stood in the darkness and shouted to the victim to put his hands in the air. The State contends that the defendant's words coupled with the fact that he was talking to the victim under cover of darkness while armed with an assault rifle and waiting uninvited on someone else's property were sufficient to establish the defendant as the aggressor. The State finally contends that in such

a situation the victim would have been entitled to try to repel an attack by the defendant, citing *People v. Sloan* (1986), 111 Ill. 2d 517, 490 N.E.2d 1260.

We agree with the trial court that there was evidence to support the finding that the defendant was the initial aggressor. We do not, however, agree with the trial court that evidence supporting the finding of the defendant as an initial aggressor necessarily precludes instructing the jury on self-defense.

■ In this case, while there was evidence to support a finding that the defendant was the initial aggressor, that evidence was not so compelling that no other finding could have been made. It is this difference which distinguishes the instant case from *People v. Sloan* and *People v. Davidson* (1987), 160 Ill. App. 3d 99, 514 N.E.2d 17, both of which involved situations in which the defendant invaded the victim's home while armed. In this case, the defendant pursued a course of action that was to say the least unwise and rash. Whether he was truly only wanting to discuss the theft of his guns with his half-brother or whether he was on a vigilante self-help mission makes little difference insofar as the victim is concerned at this time. Neither procedure is one that should be encouraged. However, the defendant did not threaten, strike, verbally abuse, or in any other manner act aggressively insofar as the victim was aware. While the defendant was armed and while he ordered the victim and others to raise their hands, this may or may not have been enough to convince the jurors that the defendant was the initial aggressor. Since they could have made that conclusion based on the evidence before them, they should have received instructions on the initial aggressor status of defendant. However, since they also could have come to the conclusion, based on the same evidence, that the defendant was not the initial aggressor, the defendant was entitled to an instruction on self-defense. Therefore, the trial court erred in refusing to instruct the jury on self-defense under the circumstances of this case and we must reverse on that point. (See *People v. Ellis* (1982), 107 Ill. App. 3d 603, 614, 437 N.E.2d 409, 418.) Once the jury is instructed on both issues, it is then able to resolve the question on either hypothesis. *People v. Day* (1972), 2 Ill. App. 3d 811, 813, 277 N.E.2d 745; *People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340; *People v. Crue* (1977), 47 Ill. App. 3d 771, 362 N.E.2d 430.

In view of the foregoing, we find it necessary to reverse this case because of the court's failure to instruct on self-defense.

The State in its brief requests that, in the alternative, if we find that the self-defense instruction should have been given, this court also find that defendant may be retried on the original charge of first-degree murder rather than second-degree murder of which the defendant was convicted. The defendant argues that he cannot be retried on the charge of first-degree murder.

■ We agree with defendant's position for several reasons. First, under the old murder/voluntary manslaughter statutes, a conviction of voluntary manslaughter operated as an acquittal of a murder charge. (*People v. Echoles* (1976), 36 Ill. App. 3d 845, 344 N.E.2d 620.) Since the second-degree murder statute was written for the purpose of substituting the new name, but not a whole new body of law, for the old voluntary manslaughter crime, those earlier cases still control on this issue. *People v. Timberson* (1989), 188 Ill. App. 3d 172, 544 N.E.2d 64; see also Steigmann, *First & Second Degree Murder in Illinois*, 75 Ill. B.J. 494 (1987).

Second, as a general proposition, prosecution of a greater offense is barred after conviction of a lesser-included offense. (*Illinois v. Vitale* (1980), 447 U.S. 410, 65 L. Ed. 2d 228, 100 S. Ct. 2260; *People v. Mueller* (1985), 109 Ill. 2d 378, 488 N.E.2d 523.) In *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, our supreme court noted that voluntary manslaughter is a lesser-included offense of murder. Therefore, the defendant's conviction of the lesser-included offense of second-degree murder would preclude his retrial on the first-degree murder charge. Finally, while the jury did have to find that the prosecution had proved all of the elements of first-degree murder before proceeding to the second-degree murder consideration (*People v. Buckner* (1990), 203 Ill. App. 3d 525, 532, 561 N.E.2d 335, 340), it does not follow that the jury first found that the defendant was guilty of first-degree murder because the mental states involved in each of these offenses are mutually inconsistent (*Hoffer*, 106 Ill. 2d 186, 478 N.E.2d 335). Therefore, the fact that the State may have proved the elements of first-degree murder does not mean that the jury has found the defendant guilty of first-degree murder. In conclusion, upon a retrial the defendant cannot be tried for first-degree murder. See *People v. Timberson* (1991), 213 Ill. App. 3d 1037.

The defendant has also raised two evidentiary issues and a sentencing issue for our review. The sentencing issue has obviously become moot in view of our decision to reverse. With regard to the evidentiary issues, we decline to address them other than to note that both are relatively close questions in view of the evidence elic-

ited during the first trial. Since we are unable to determine which witnesses may be available and the theories upon which the parties may proceed on the retrial of this case, we do not feel it is appropriate to address these issues in this opinion and therefore decline to do so.

Reversed and remanded.

HARRISON and HOWERTON, JJ., concur.