People of the State of Illinois, Plaintiff-Appellee, v. Charles Scott, Defendant-Appellant.

Gen. No. 52,158.

First District, First Division.

April 6, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Professor James R. Thompson, Northwestern University School of Law, Evanston, Theodore A. Gott-

fried and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, and Francis X. Riley, Special Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

Defendant was charged with murder, tried by the court without a jury and was found guilty of voluntary manslaughter. The trial court sentenced him to the penitentiary for three to eight years. Defendant seeks to reverse his conviction based upon the contention that there was insufficient evidence to support his conviction for voluntary manslaughter. He argues that the evidence could only result in one of two conclusions: either he was guilty of murder or he acted in self-defense to commit a justifiable homicide. The State contends in the alternative that there was ample evidence of provocation or that the defendant acted unreasonably in utilizing his right to self-defense.

The Criminal Code defines the crime of voluntary manslaughter as follows:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

"(1) The individual killed, or
"(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

"Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

108

"(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill Rev Stats, c 38, § 9–2.)

With this statutory context in mind, we will analyze the evidence in the instant case.

The State called Martha Scott, who had been married to defendant for some 20 years. She stated that as of July 16, 1966, she had been legally separated from the defendant for a year and one-half and that she and her children had been living with Olden Oatis since September of 1965. On July 16, 1966, Oatis picked up Mrs. Scott at 3:30 p. m., from her job at Wesley Memorial Hospital. He drove to the area of 63rd and Eggleston streets where Oatis parked his car about three car lengths from 63rd and on Eggleston. The witness saw defendant standing on the corner of 63rd and Eggleston and was calling to their son Kevin Scott. She stated that Kevin was on Eggleston and she also called to him from Oatis' car. She then related that her husband looked in the direction where Oatis and she were sitting in the car; that the defendant reached into his pocket and opened a knife, and that defendant walked towards the car. Oatis then pulled a knife and got out of the car. The witness was not sure whether Oatis had opened his knife. She then left the car and started towards 63rd Street. She observed Oatis and the defendant come together and saw the defendant strike Oatis with his knife upon the upper portion of Oatis' body. Oatis fell to the ground and the defendant was over his body. The witness said that the defendant administered some jabbing blows with his right hand to Oatis while on the ground.

On cross-examination, the witness said that on July 15, 1966, she had told a friend of the defendant that if her husband didn't send some money for her children that she would have him arrested. She also stated that her husband saw two of her children somewhat infrequently, with the children going out to see their father. She never let the defendant into her apartment according to her testimony.

Gregory Scott, the nine-year-old son of the defendant was called by the State. After this child's competence was established, he was questioned concerning the date of the homicide. Gregory said that he saw his father at 10:00 a. m. that morning. Defendant asked for Mrs. Scott and Gregory told him she was at work. Gregory then found his little brother Kevin at the defendant's request. Defendant gave both of them a dollar and said he was going to take them some place. Gregory related that he and his brother went to their apartment, changed clothes and went back down to the street. They could not find their father. The boys then changed clothes and went to play. Gregory next met his father at 2:30 p. m., when his father asked him to steal the apartment keys because that night he was going to kill his mother and Oatis. Gregory then left and returned to his apartment. Defense counsel elicited from Gregory that his father visited him about every two weeks. He stated that defendant gave him some money on these occasions. According to Gregory, two of his father's visits were in the apartment of Mrs. Scott, where Oatis also lived. Gregory also stated that his father was living in a hotel about a block from this apartment.

The State next called Kevin Scott, the seven-year-old son of the defendant. Following the establishment of his competency to testify, he testified as to the events of July 16, 1966. He corroborated his brother's story of

110

their encounter with the defendant in the morning. He then testified to his observation of the fight between Oatis and the defendant. The witness said that he saw his father at the cleaners; that the witness was walking with a friend toward that corner; and that his father and Oatis both called to him, the latter from a car where he saw his mother. Kevin said his father asked him who he was talking to. His father then walked toward the car. The boy witnessed the stabbing and saw both men draw their knives. He said his father was the first to pull out a knife. While standing near the scene, he saw his father cut Oatis, then cut him again after Oatis had fallen to the ground. According to Kevin, his father then ran and was apprehended.

The witness was not sure as to when he first saw his father on the day in question. Kevin also testified as to the visits made by his father on previous occasions and that his father sometimes gave him money. According to this witness, Oatis got out of his car and then pulled a knife which he opened. It was established that Kevin was on the same side of the street where the fight took place.

Police Officer Gaynor testified as to the events of July 16, 1966, when he arrived at 63rd and Eggleston at 4:30 p. m. Oatis was found in a pool of blood with a knife lying alongside his body. The Officer picked up that knife and found another knife in the street near 63rd and Eggleston. Both knives were open. The Officer identified these knives at the trial, which had been previously identified by Mrs. Scott as the instruments belonging to the defendant and Oatis.

Evidence of bloodstains upon the blade of the knife, purported to be the defendant's, was introduced by stipulation. Further stipulation was entered into with regard to the autopsy conducted on Oatis' body. The medical ex-

111

amination revealed a number of slash wounds upon the neck, upper left chest and abdomen. The pathologist's opinion was that Oatis' death was caused by a laceration of the heart. The knives were then admitted into evidence.

The defense produced Susan Johnson, who was defendant's landlady for about five months. The witness said she was acquainted with Mrs. Scott, having seen her twice. She stated that Mrs. Scott had called her on July 18, 1966. Mrs. Scott was recalled and defense counsel inquired about the conversation with Mrs. Johnson. Mrs. Scott denied she had told Mrs. Johnson that deceased had his knife open in the car or that Mrs. Scott told the deceased to put away his knife. Mrs. Johnson then testified that in her phone conversation of July 18, Mrs. Scott stated that Oatis had pulled out his knife before leaving the car and that she then ran from the car.

The defendant then testified as to the occurrence of July 16. He stated that he saw his sons that morning around 10:30 or 11:00 a. m., and that he gave them some money and told them he had planned to take them to an amusement park. Defendant then proceeded to the area of 63rd and Halsted where he went into a tavern. He stated that he remained there until 3:45 p. m., tending bar for a friend. Defendant denied that he had anything to drink while at this bar. Defendant returned to 63rd and Eggleston and rang the bell to his wife's apartment. He wanted to talk to her because a friend told him to contact her. Defendant denied that he saw Gregory at that time or that he told his son he was going to kill Oatis and Mrs. Scott.

Defendant then proceeded south on Eggleston from 63rd Street. According to his version of the story, he heard his wife laugh, turned back to the right and then turned back. At this point, defendant said he was con-

fronted by Oatis, who had a knife in his hand. Defendant and Oatis then engaged in a fight with Oatis pressing the defendant against a car. During this struggle, defendant managed to get hold of Oatis and reached into his pocket for his own knife. Defendant then stated he opened his knife with one hand by drawing it against his leg. He then swung at the deceased and cut him. He did not recall how many times he struck the deceased. Defendant claimed he saw no one else in the vicinity and didn't know what was happening. After the fight he threw away his knife and proceeded to a barber shop where he was arrested after he allegedly called the police.

On cross-examination, the defendant testified that he had only met Oatis on one prior occasion and that he did not know that Oatis was living with his wife at the time of the homicide. Defendant maintained that deceased had initiated the attack which resulted in Oatis' death. Defendant identified his knife and Oatis' knife. He attempted to illustrate to the court how he opened the knife with one hand. Defendant denied that he ever struck the deceased while the latter was on the ground.

Based upon this testimony, the trial court found the defendant guilty of voluntary manslaughter. The trial court expressed the reasons for the finding stating that the evidence showed that when deceased left his car his knife was out and open and that the defendant's testimony as to the opening of his knife with one hand was disbelieved. We think the trial judge's comments reveal that the conviction of defendant for voluntary manslaughter was based upon the finding that defendant acted with an unreasonable belief that the homicide was justified under the circumstances.

Defendant contends that the evidence established either murder or justifiable homicide by reason of self-defense. We cannot agree with this contention. The

evidence clearly established that both men drew their knives prior to the fight. The testimony showed that Oatis had brandished his knife before leaving his car and that defendant produced a knife while advancing toward the deceased. There is some disagreement as to which man was the aggressor, but there is ample testimony that after deceased fell to the ground, the defendant administered some wounds upon his body. We think this illustrates that defendant acted unreasonably. The amount of force used in defending himself from the deceased was excessive.

█ The evidence presented in this case left the trial judge with several alternatives. The court could have found defendant guilty of murder, guilty of manslaughter, or not guilty by reason of self-defense. The difference between murder and manslaughter is the absence of malice as an element of the crime in the latter offense. People v. Jones, 384 Ill 407, 51 NE2d 543 (1943). The trial court disbelieved the testimony of Gregory with regard to the defendant asking his son to steal the apartment keys so that he could kill his wife and Oatis that evening. Thus, there was no proof of malice presented by the State's evidence. Similarly, the trial court disregarded the defendant's testimony that he opened his knife with one hand while holding off the deceased.

There is a discrepancy in the testimony as to who was the first to draw a knife. However, both eyewitnesses to the homicide stated that defendant struck the deceased with his weapon after deceased had fallen to the ground. Defendant denied this but stated he was not sure as to how many times he struck the deceased.

█ In our view of the evidence we think there was substantial proof to justify a conviction of voluntary manslaughter. Our review of the record has not revealed that grave and substantial doubt that is necessary

for the reversal of the conviction. People v. Sheppard, 402 Ill 347, 83 NE2d 587 (1949). The judgment of the Circuit Court is affirmed.

Judgment affirmed.

BURMAN, P. J. and MURPHY, J., concur.