THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EVERLENA CONWELL, Defendant-Appellant.

First District (3rd Division)   No. 77-138

Opinion filed September 20, 1978.—Rehearing denied October 13, 1978.

SIMON, J., dissenting.

Anthony J. Onesto and Richard E. Zulkey, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Everlena Conwell, was indicted for murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1). After a trial without a jury, she was found guilty of the lesser included offense of voluntary manslaughter (Ill. Rev. Stat. 1975, ch. 38, par. 9—2), and was sentenced to five years probation, one year to be served in periodic imprisonment. The defendant's appeal presents two issues for review: (1) whether the evidence is sufficient to sustain the conviction for voluntary manslaughter, despite the interposed defense of self-defense; and (2) whether the State's impeachment of the

defendant's husband, through the use of a prior inconsistent statement was proper.

Delores Jenkins was stabbed in the back with a knife and died on July 2, 1975. The killing occurred at a beach park in Chicago at about 1 a.m. At trial, a police investigator, Gerard Liberty, and an Assistant State's Attorney, Michael Crane, testified to statements the defendant made about the killing hours after the incident. The defendant did not testify. Liberty said the defendant told him several versions of the event. First, she said she drove to the park to walk her dog. Seeing her husband's car in the parking lot, she left the dog, took a butcher knife from underneath the seat of her car and put it in her purse. Liberty testified that the defendant told him she went down towards the beach, where she saw her husband and Jenkins walking arm in arm. She confronted them and an argument developed. During the argument, the defendant told Liberty, the deceased "took out a black handled butcher knife from somewhere." The defendant, then, took her butcher knife out of her purse and the women fought. In this recital, the defendant said she did not recall stabbing the deceased.

In repeating her description of the events that night a second time, the defendant admitted stabbing the deceased, saying that the deceased "had something in her hand." She did not mention the deceased's "butcher knife." Shortly after these statements, Liberty called Crane in to question the defendant. In giving a third version of the incident to Liberty and Crane, the defendant again said the deceased drew a large black handled butcher knife from somewhere. When asked about the knife, though, she said she was not sure she saw a knife in the deceased's hand; instead, she said she saw "something" in the deceased's hand. She continued, telling Liberty and Crane that she and the deceased struggled. This time, the defendant said, she was uncertain whether she or her husband stabbed Jenkins. She did not know what happened to her butcher knife. The knife used to kill Jenkins was never found. Liberty said the defendant told him that she took the butcher knife with her on her walk in the park because she expected to run into her husband and another woman.

Crane corroborated Liberty's description of the defendant's third version of the stabbing. He testified that the defendant told him she took the butcher knife from her car because she thought her husband was in the park with another woman. According to Crane, the defendant said that after the stabbing she dropped her knife to the ground when her husband grabbed her hand. Her husband told her to leave and she drove home. Crane testified that during the interview the defendant was upset and crying.

Cleothis Conwell, the defendant's husband, testified as an eyewitness to the killing. Because neither the State nor the defendant would vouch for

his credibility, he was called as a court's witness. On questioning by the State, Cleothis said that he had been with the deceased prior to her death and that she had been drinking heavily. At the time of the stabbing he was walking on the beach with her "to get her straight." He said he was holding the deceased with his right hand and that the deceased was "right next to me, to the right side of me." During the walk, they encountered his wife, the defendant. After some conversation between his wife and him, Jenkins said "let's get rid of this bitch." Then Jenkins reached "in her bosom with her left hand" and pulled out a paring knife, swung it at the defendant and missed, but cut him on the top of his right hand. He said his wife "swung back" at the deceased; he told his wife not to "be out here clowning" and to go home. He said his wife had a long black handled butcher knife. His wife left, he turned to the deceased and for the first time noticed blood on her left shoulder. He said he saw the deceased earlier in the evening place the paring knife in her bosom.

In questioning by the defendant, Cleothis again described the stabbing. This time he said he was holding the deceased by her right hand; his right hand was hanging by his side. With her left hand the deceased pulled out the paring knife, which she carried in a vertical fashion in the middle of her bosom. The deceased swung the knife at the defendant, missed, and, in a sweeping motion, reached around Cleothis and cut his right hand which was by his side. According to Cleothis, the momentum of the victim's thrust bent her to the ground, dipping her left shoulder close to the ground and exposing her back to the defendant. Cleothis said his wife "took out a knife" and brought it down in the deceased's back. Cleothis said his hand was bleeding from the cut; he asserted it never was bandaged that night even while he was questioned at the police station but that the police never noticed it.

Cleothis admitted that he lied to the police when they questioned him shortly after the stabbing, giving them an account of the killing completely different from the one he was relating at trial. He said he never told the police that he had seen the deceased place the paring knife in her bosom or that the deceased, when confronting his wife, drew it and swung it at his wife and him. Several times during the State's examination of the witness, the State questioned him about specific details in the story he told the police. At times Cleothis would admit making a statement, but assert that the particular statement was untrue. A number of times he denied making a particular statement at all. The State never subsequently produced evidence proving he had made the statements inquired about. During the questioning, the State showed Cleothis some papers. Although he admitted he signed the papers, and initialed them, he refused to say that the papers were his statement to the police. He said he never read the

material he signed at the police station. He testified that the police beat and threatened him, forcing him to sign some papers.

Prior to Cleothis' testimony, attorneys for both sides and the trial court discussed, on the record, the procedures for impeaching a court's witness by a prior inconsistent statement. The court indicated that impeachment through an inconsistent statement would be allowed. But, if the witness denied making a statement, the State would not be permitted to prove that the witness had made it through the introduction of additional evidence, nor would the court conduct a collateral proceeding to determine the voluntariness of the statement. Upon assurances by the court that no information revealed by the State through questions based on a prior inconsistent statement would be used substantively, the defendant withdrew a motion to suppress Cleothis' prior statements to the police.

Investigator Liberty testified that prior to questioning the defendant, he and another officer searched the scene of the stabbing for physical evidence. He said that using flashlights, they inspected an area around a blood stain in the grass for 25 to 30 feet in each direction from where the deceased had lain. He described the area as being scattered with debris; they found no evidence.

Two other officers, Gholar and Ryan, testified that in a subsequent search at the scene of the stabbing they found a small yellow-handled knife, with a blade 2½ inches long and ¼-inch wide. Officer Gholar said that shortly after the stabbing, he conducted a quick, unaided investigation, three to four feet around the blood stain in the grass and found nothing except rubbish. Officer Ryan said later he examined the same area, with at least 10 other policemen, all using flashlights. Their search covered a 40- to 50-yard circle from the blood stain and although it was littered, no one found any evidence. Ryan said he sporadically returned to the area throughout the night and at 5:30 a.m. he found a knife about four feet from the blood stain. Without lifting it, he summoned Gholar and showed it to him. These officers stated that the lighting during their initial searches was poor and that the handle of the knife was obscured by the grass. Ryan said that although several police cars were in the area throughout the night, just prior to his discovery of the knife, no cars of officers were there. He said that several times when he visited the scene he saw people in the area who were unconnected with the police.

The trial judge commented that there were substantial inconsistencies between the various statements given by the defendant, and the testimony of her husband. He ruled that, at the time of the stabbing, the defendant's perception of harm, and her response to the deceased's actions with deadly force, was unreasonable. Although indicted for

murder, he found her guilty of the lesser included offense of voluntary manslaughter.

The defendant argues that her conviction for voluntary manslaughter should be reversed because the State failed to refute, beyond a reasonable doubt, evidence which demonstrates that at the time of the stabbing she was acting in self-defense. In each of her statements to the police, she notes, her action in drawing her butcher knife is described as a response to the deceased's aggressive presence after the deceased had something in her hand or after the deceased held a "large handled black butcher knife," and that the stabbing was a result of a fight between them. The defendant contends that her exculpatory statements are independently corroborated by her husband's testimony and the discovery of the paring knife at the scene of the killing by the police. According to the defendant, her husband's description of the deceased as the aggressor attempting to stab them with a paring knife, is not rebutted by any evidence. She points out that after an affirmative defense is raised, it is the State's duty to disprove it, beyond a reasonable doubt. (Ill. Rev. Stat. 1975, ch. 38, par. 3—2.) Here, the defendant contends, the State has not so overcome her affirmative defense, and that, therefore, there remains a reasonable doubt of her guilt.

Section 7—1 of the Criminal Code defining self-defense permits the use of force against another to the extent the actor "reasonably believes" force is necessary to defend against the other's use of unlawful force. (Ill. Rev. Stat. 1975, ch. 38, par. 7—1.) Force which is likely to cause death or great bodily harm, however, is justified only upon a reasonable belief that it is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1975, ch. 38, par. 7—1.) When the actor's belief that lethal force will be exonerated is "unreasonable," a conviction for voluntary manslaughter is appropriate. (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(b).) Affirmance of this conviction, then depends on whether the evidence shows that although the defendant believed her act of stabbing the deceased was justified, that belief was unreasonable. *People v. Speed* (1972), 52 Ill. 2d 141, 284 N.E.2d 636.

■■ The reasonableness of the defendant's resort to force and the amount of force used are factual determinations solely for the trier of fact, in this case the trial judge, to decide. (*People v. Thompson* (1977), 55 Ill. App. 3d 561, 371 N.E.2d 267.) A reviewing court must not substitute its judgment for the trier of facts on these questions. (*People v. Pickett* (1976), 35 Ill. App. 3d 909, 913, 342 N.E.2d 766, 769.) While it is the State's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense, the finding by the trier of fact that the defendant's belief of danger was unreasonable and her use of force excessive cannot be disturbed unless it is so improbable, erroneous or unsatisfactory as to

raise a reasonable doubt of the defendant's guilt. *People v. Diaz* (1976), 38 Ill. App. 3d 447, 453, 348 N.E.2d 199, 205.

■■■ First, the trial judge could find evidence in the record sufficient to sustain the defendant's conviction of voluntary manslaughter. As related through the testimony of Liberty and Crane, the defendant drew her butcher knife prior to an altercation with the deceased because the deceased "had something in her hand"; she then fought with the deceased, stabbed and killed her. Nowhere in the record is there any assertion that the defendant actually believed the deceased posed an imminent threat of harm to her when she drew her knife and stabbed the deceased. The only evidence of the act of stabbing describes the deceased as twisted down almost to the ground, held by the defendant's husband, her back to the defendant. It is not improbable to find the defendant did not believe the stabbing and killing of a person so incapacitated was absolutely necessary to prevent her own death or great harm. (See *People v. Scott* (1970), 123 Ill. App. 2d 107, 259 N.E.2d 594.) Further, the trial judge, in finding the defendant's self-defense belief unreasonable, could have considered that the defendant entered the park armed with the deadly weapon, in search of the deceased. (See *People v. Williams* (1968), 95 Ill. App. 2d 421, 237 N.E.2d 740.) As noted in *People v. Pickett* (1976), 35 Ill. App. 3d 909, 913, 342 N.E.2d 766, 769-70:

> "Where, as here, a defendant is not found guilty of murder, the circumstances that might have been considered to show premeditation or malice need not be disregarded in determining the reasonableness of his belief that he had to use deadly force."

■■ Second, the trial judge could find that the evidence of self-defense did not raise a reasonable doubt of her guilt. The support for the defendant's theory of self-defense derived from her husband's version of the stabbing and the subsequent discovery, by the police, of a small knife near the scene does not necessarily vindicate her claim nor substantially detract from the evidence affirming her conviction. Even though this evidence has not been directly rebutted, the trier of fact does not have to accept it. (See *People v. Johnson* (1969), 108 Ill. App. 2d 150, 156, 247 N.E.2d 10, 13.) The trial judge had the responsibility to evaluate the credibility of the witnesses, weigh the evidence and draw inferences therefrom. (*People v. Echoles* (1976), 36 Ill. App. 3d 845, 344 N.E.2d 620; *People v. Pickett.*) As finder of fact, he was free to accept or reject any part of the testimony presented (*People v. Young* (1973), 11 Ill. App. 3d 609, 297 N.E.2d 298), considering its probability or improbability, the circumstances surrounding the killing and other evidence. (*People v. Walden* (1976), 43 Ill. App. 3d 744, 357 N.E.2d 232.) His determinations will be overturned only if they are palpably erroneous. *People v. Walden* (1976), 43 Ill. App. 3d 744, 749, 357 N.E.2d 232, 236.

In the instant case we cannot say that the rejection of Cleothis' exculpating testimony is so erroneous as to raise a reasonable doubt of the defendant's guilt. The court could have found his credibility so impeached by his position as a court's witness (see *People v. McKee* (1968), 39 Ill. 2d 265, 235 N.E.2d 625), his admissions that he lied to the police, the inconsistencies between his story and the defendant's, and his tardy revelation of exonerating material that his testimony was substantially discredited and inadequate to raise a reasonable doubt of the defendant's guilt.

Further, the subsequent discovery of the paring knife itself is subject to a variety of inferences, many of which the judge could have found lessened its value as corroboration of the self-defense rationale. The lapse of time between the searches and its discovery, the material disparity between its actual size and the description of "large black handled butcher knife" the defendant gave the police, and the fact that it is linked to the deceased only through Cleothis' story all go to weaken its impact. As such the judge could find that this evidence did not provide a reasonable doubt that the defendant acted in self-defense. It cannot be said that the factual determinations of the trial judge in the case were improbable or unsatisfactory; the record is sufficient to sustain the conviction for voluntary manslaughter.

The defendant also presents a procedural question, contending that the trial court erred in permitting the State to impeach her husband through statements he denied making. It is suggested that the State's failure to present rebuttal evidence proving Cleothis voluntarily made such statements, left unsupported implications in the record, prejudicing her case and requiring a new trial. In *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, the defendant notes, the supreme court held that even in a bench trial, the existence of substantial insinuations which, if considered, could seriously impeach the credibility of the defendant and his witnesses "would demand that remedy."

The trial judge before any questioning of Cleothis indicated he would follow procedures outlined in *McKee*, which carefully limit impeachment of a court's witness by a prior statement. When the court's witness denies making a specific out-of-court statement, according to *McKee*, the matter should end, and no additional evidence should be introduced to prove that the defendant made the statement "because to pursue it further would be trying a collateral issue rather than a fact material under the indictment." (*People v. McKee* (1968), 39 Ill. 2d 265, 270, 235 N.E.2d 625, 628.) After the trial judge announced this procedure, the defendant withdrew a motion to suppress Cleothis' out-of-court statements and during the trial did not object to the State's failure to "prove-up" the alleged statements.

■■ Initially, it appears that by her silence at trial when she knew about the procedures that would be followed, the defendant waived the right to complain about the impeachment method. (*People v. Scott* (1972), 52 Ill. 2d 432, 288 N.E.2d 478.) Further, even if this acquiescence is not considered a waiver, the *Nuccio* remedy of a new trial is inapplicable because the defendant never demonstrates, as was done in *Nuccio*, how the State's actions prejudiced her. The few instances in this case in which the procedures were used can hardly be deemed the "substantial number" of insinuations referred to in *Nuccio*. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 396, 253 N.E.2d 353, 364.) Finally, aside from the credibility issue, the defendant does not demonstrate that the judge considered improper evidence in making his decision by relying on information from the State's questions as substantive evidence. In a bench trial, it is presumed the court will consider only competent evidence in making its decision. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59, 369 N.E.2d 849, 852.) In order to rebut this presumption there must be an affirmative showing that the court actually used the improper evidence; the defendant has made no such attempt here. In fact, the many assurances made by the judge that such information would not be so used satisfied the defendant at trial; here, the fact of such assurances shows that the judge was aware of the evidentiary problem and mitigates against finding that the impeachment method improperly damaged the defendant's case.

For these reasons and for those already discussed, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGILLICUDDY, J., concurs.

Mr. JUSTICE SIMON, dissenting:

Because the evidence at trial failed to establish beyond a reasonable doubt that the defendant unreasonably believed herself in danger of imminent death or great bodily harm, I dissent from the majority opinion affirming her conviction of voluntary manslaughter.

A conviction can be sustained on review only on the basis of evidence which removes all reasonable doubt of the defendant's guilt, and excludes every other reasonable hypothesis. A conviction can be sustained only on the strength of the State's case, rather than on the weakness of the defendant's case. (*People v. Coulson* (1958), 13 Ill. 2d 290, 296-97, 149 N.E.2d 96.) Here, the State failed to meet its burden of proof that the defendant's belief that she was in danger of imminent death or great bodily harm when she stabbed Delores Jenkins was unreasonable.

According to the evidence most favorable to the defendant, when she

encountered her husband and Delores Jenkins on the beach, Jenkins was drunk, told the defendant's husband, "let's get rid of this bitch," and then swung at the defendant with a knife. The only permissible conclusion under this set of facts is that the defendant reasonably believed that she was in imminent danger of great bodily harm or death: an intoxicated woman threatened the defendant and attacked her with a deadly weapon. The defendant's response to this attack was legally excusable.

On the other hand, to sustain a voluntary manslaughter conviction, the State had to prove beyond a reasonable doubt that the defendant's belief was unreasonable. The sole evidence the State could produce on the defendant's state of mind were her own statements to the authorities at the time of her arrest—statements understandably imprecise because they were given to the police during the course of 1½ hour interview by a woman who was crying and upset, never had been involved with the police before, and only a few hours earlier had been involved in a struggle resulting in a violent death. By relying solely on the testimony of the police officers and the assistant state's attorney recounting the defendant's account of the incident, the State failed to meet this burden. Defendant's statements were as compatible with the defendant's innocence as with her guilt, and were insufficient to show that the belief under which she acted was unreasonable. In her first statement, the defendant indicated that the deceased had a knife; the second time, the defendant stated she thought the deceased had "something in her hand." In her third statement to the authorities, the defendant stated that she saw the knife in Jenkins' hand, and later that she drew her own knife when she saw "something" in Jenkins' hand. The consistent thread in each of the defendant's statements is that she believed she was under attack by an armed woman she encountered with her husband, and that she and that woman engaged in a struggle. Nothing in these statements demonstrated beyond a reasonable doubt that the defendant's belief that she was in danger of great bodily harm or death was unwarranted.

The majority observes that the trial judge was free to reject the evidence of self-defense which the defendant's husband, called as the court's witness, offered in his testimony. Yet, even the majority concedes that the husband's testimony was not directly rebutted. And if the husband's trial testimony had any impact, it supported the defendant's self-defense theory because the prior inconsistent statements were, as the trial judge indicated, not admitted as substantive evidence of the defendant's guilt or innocence, but admitted solely to impeach the husband. Because the only possible negative effect of the husband's prior inconsistent statements would have been to cancel out his trial testimony favorable to the defendant, the State was left with only the testimony by

the police officers and the assistant state's attorney as to what the defendant told them.

The majority also states that the husband testified that when the deceased was stabbed she was twisted down and held by the defendant's husband so that her back was exposed to the defendant. I do not believe this account gives the complete picture of the husband's testimony. He testified that the death occurred in the midst of a violent struggle, when the defendant reacted to the deceased's sweeping stab at her. Only after the deceased had swung did the defendant respond immediately and stab her, and any exposure of the deceased's back to the defendant resulted from the deceased's sweeping stab at the defendant. Although the husband testified that he was holding the deceased's right hand there is nothing in the record to indicate he was holding it in a way which restrained her. Rather, it is more likely he was holding her right hand because they had been walking on the beach hand-in-hand. And, none of the testimony shows how much control he was exerting over her or whether she was in any way subdued. Thus, it is erroneous to conclude from this testimony that the defendant's belief she was under imminent threat of death or great bodily harm was unreasonable because the deceased was so restrained and off-balance as to be a helplessly immobilized target.

Further, the search for and discovery of a knife by Officer Ryan, discussed at length in the majority opinion, did not prove the defendant in any way culpable. The State's suggestion that this knife was planted by the defendant and her husband after Jenkins' body was removed is pure speculation—the State introduced no evidence whatsoever to support this theory.

Finally, the majority notes that the record contains no assertion that the defendant actually believed the deceased posed a threat to her. However, it was not the defendant's obligation to offer such proof. It is crucial to point out again that the defendant's conviction must rest on the strength of the State's proof that her belief she was being attacked was unreasonable. Thus, that the defendant may have failed to prove that she acted in self-defense did not lessen the State's burden of proving the elements of the offense of voluntary manslaughter. Here, the proof offered by the State of the defendant's state of mind was woefully lacking. In such a case, the presumption of an accused's innocence until guilt is proved must be respected. By emphasizing the weaknesses in the evidence favorable to the defendant, the majority runs perilously close to placing the burden of proof in a criminal trial upon a defendant.

I do not take issue with the maxim quoted by the majority that it is the trial court's duty to determine the credibility of witnesses, including the

weight to be given to their testimony, and that on review this court will not substitute its judgment for that of the trier of fact. Nevertheless, a reviewing court has a duty to examine the evidence in a criminal case; if that evidence raises a serious doubt of a defendant's guilt, a conviction must be reversed. Otherwise, the concept of reasonable doubt, one of the cornerstones of our criminal justice system, would be irrevocably eroded.

Accordingly, I would reverse the trial court's judgment finding the defendant guilty of voluntary manslaughter.