THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WEBSTER MILES, Defendant-Appellant.

First District (6th Division)   No. 1—88—0112

Opinion filed September 1, 1989.

Lance Haddix, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Marilyn Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Webster Miles, was charged with two counts of aggravated battery and one count of attempted murder. After a bench trial in the circuit court of Cook County, the court found defendant guilty on all three charges, and then ruled that the two aggravated battery counts merged into the attempted murder count. Accordingly, the court entered judgment on the attempted murder count only and sentenced defendant to 10 years of incarceration. Defendant now appeals. We affirm.

The evidence presented at defendant's trial established the following. The defendant, Webster Miles, at the time of trial, was married to Patricia Miles. Prior to her marriage to the defendant, Patricia Miles had a child, Angelo, with the victim, Dwight Grant. Webster Miles, his wife, Patricia, Angelo, and their other children lived in an apartment in Chicago, Illinois. Patricia Miles' sister, Earlene Williams, and her husband, Charles, lived in the apartment next door. The victim, Grant, knew the Williamses also.

The testimony at trial established that there had been previous problems between the defendant and Grant. Grant had been to the Mileses' prior homes in the past, and in one incident, defendant and his wife said that the police were called when Grant allegedly threatened defendant with a gun. In Grant's testimony, he admitted that the police were called on one occasion when he went to the Mileses' apartment, but he denied that he had ever threatened defendant with a gun. The Mileses did not file a formal complaint against Grant, and the testimony indicated that, other than that one incident, the fights between the defendant and Grant were strictly verbal.

At about 1:30 p.m. on June 15, 1986, which was Father's Day, Grant went unannounced to the Mileses' apartment. Grant apparently went there to pick up his son Angelo for the day, but Angelo was not ready when he arrived. Grant and Patricia Miles then got into a heated argument, and, according to Patricia Miles, during the argument Grant knocked over a table and knocked some cards out of her hand. However, Grant testified that he and Patricia only had a minor verbal disagreement. The defendant was not present during the argument.

Following this argument between Grant and Patricia Miles, Grant went next door to the Williamses' apartment for a short time, and then left. Later, the defendant and his wife, Patricia, also went next door to the Williamses' apartment. At this time, defendant was unaware that Grant had been in his apartment earlier, or that Grant, while in the apartment, had argued with his wife. Thereafter, at about 4:30 p.m., Grant returned to the Williamses' apartment and, when he entered through the back door into the kitchen, the defendant was already in the kitchen of the Williamses' apartment. As soon as Grant came in through the back door, defendant then left through the back door, and although both had seen the other, there were no words exchanged between the two. When defendant left, he testified that he went next door to his own apartment.

After the defendant left the Williamses' apartment, Earlene Williams prepared a plate of food for defendant and took it next door to the defendant's apartment. Subsequent to Earlene Williams leaving defendant's apartment, defendant said, his daughter, Crystal, told him that Grant had been to their apartment earlier and had argued with Patricia Miles.

Defendant testified that he then returned to the Williamses' apartment, entering through the back door to the kitchen. He said that he had gone back to the Williamses' apartment to speak with Grant. When defendant entered the Williamses' apartment, Earlene Williams, Charles Williams, and a friend of theirs were all in the kitchen. Defendant stated that as he entered the kitchen, Grant was also entering the kitchen from the hallway. Grant began to yell at him, defendant said, but he could not understand what Grant was yelling. Defendant claimed that while Grant was yelling at him, Grant was pointing at him with one hand and had his other hand in his pocket. Defendant testified that even though he saw no weapon in Grant's free hand, he believed that Grant had some kind of weapon in his pocket. Defendant then confronted Grant in the hallway leading to the kitchen, and, while in the hallway, defendant picked up a 2½-foot pipe from a pile of junk. It is the defendant's position that he picked up the pipe because Grant had threatened him on a previous occasion with a gun, and, thus, he wanted to ensure that Grant did not hit him with whatever was in his pocket. However, on cross-examination, defendant admitted that he was not afraid that Grant would hurt him, but rather, was angry since he had just discovered that Grant had argued with his wife about Angelo. Once defendant grabbed the pipe, he said, he hit Grant in the head once, but, because he was in the close confines of the hallway, he did not hit Grant with a full swing. Grant

fell, and a bicycle fell on top of Grant as he fell down. Defendant stated that while Grant was on the floor, he hit him on his legs, as this was the only part of Grant's body that was not covered by the bicycle. Immediately thereafter, defendant said his wife ran into the hallway yelling at him to stop. He then stopped hitting Grant and ran out. Defendant said he did not intend to kill Grant.

During defendant's cross-examination testimony, the State introduced a statement signed by the defendant on August 8, 1986. In this statement, defendant said that when he first left the Williamses' apartment, he went out to the back porch, picked up a pipe, and then reentered the Williamses' apartment with the pipe in his hand. Furthermore, in his statement, defendant stated that Grant did not have any weapon in his hand and that he hit Grant in the head twice with the pipe, not once. When questioned by the State about these inconsistencies between his testimony and the statement, defendant explained that these portions of the statement were incorrect. He asserted that even though he knew and understood when he signed the statement that these particular portions of the statement were incorrect, he signed the statement anyway because the assistant State's Attorney who took the statement, Ms. Martin, had threatened to throw him in jail if he did not sign it.

In contrast to the defendant's version of the story, Grant testified that he did not threaten defendant at any time that day. He said that he did not have a weapon in his hands and that he did not have either of his hands in his pockets when defendant came into the kitchen. Additionally, Grant stated that when he saw the defendant come in the Williamses' back door, defendant already had a pipe, approximately 2½ feet in length, and approximately 1½ inches in diameter, in his hands. Grant testified that defendant then came directly towards him with the pipe and hit him in the head with a full swing. That was, Grant said, the last thing he remembered before he lost consciousness.

Earlene and Charles Williams, who were in the kitchen when the defendant returned to their apartment, also testified at trial. Their testimony essentially substantiated Grant's testimony as well as the facts set forth in the defendant's statement. They said that the defendant ran in through the back door to their apartment with a pipe in his hand and immediately went towards Grant, who was also in the kitchen. Furthermore, they stated that Grant did not threaten the defendant in any way and that Grant did not have a weapon. They also said that when the defendant entered their apartment, he was swearing at Grant. The defendant went up to Grant, the Wil-

liamses related, hit him twice in the head with full swings, and Grant fell to the floor. A bicycle fell on top of Grant, and Grant started to convulse. Defendant then hit Grant approximately three more times on his legs, apparently, they said, because the rest of Grant's body was covered by the bicycle. At that point, Charles Williams grabbed the defendant to stop him and defendant ran out the door.

Grant testified that as a result of the attack, he had stitches in his head and on his leg, a plate inserted in his head, and that he now suffers from a partial hearing loss as well as headaches.

After the incident, on August 8, 1986, defendant was later found and taken into custody by the police. Detective Thomas Skol testified that on that date he read defendant his rights and told defendant of the allegations against him. After that, Detective Skol said, defendant told him what had happened on June 15, 1986. Detective Skol then called the State's Attorney's office and Assistant State's Attorney Nancy Martin came to the station. Detective Skol said that Ms. Martin again explained defendant's rights to him, explained that she was not his attorney, and that the defendant responded that he understood the explanation. Then, Detective Skol stated that defendant told his story to Ms. Martin again while he was present. Ms. Martin wrote down what the defendant had said, and when she finished writing, she asked defendant if he could read and write, and he said yes. She then read the statement aloud, including a portion which again explained defendant's rights. After she finished, she gave defendant the opportunity to make any corrections he desired. Defendant did not make any corrections, Detective Skol said, nor did Ms. Martin ever threaten or coerce the defendant into signing the statement. After defendant examined the statement, the defendant, Ms. Martin, and Detective Skol all signed the statement.

At the close of all this evidence, the court, as stated earlier, found defendant guilty on all three counts, merged the aggravated battery counts into the attempted murder count, and entered judgment on the attempted murder count only. Defendant, who was represented by the public defender throughout the trial, then filed a motion for a new trial on December 4, 1987. A hearing was held on that motion on December 9, 1987, and, following the hearing, the court denied the motion. The court then conducted a sentencing hearing and thereafter sentenced defendant to 10 years of incarceration. Apparently, in the interim between the filing of the defendant's motion and the hearing, new counsel for the defendant, Lance Haddix, was hired by defendant's family, although Mr. Haddix did not file his appearance in the case until some time after December 9, 1987. Mr. Haddix was, how-

ever, present in court both on December 4 and on December 9, 1987. At the end of the sentencing hearing, on December 9, 1987, Mr. Haddix stepped before the court, explained that he had been recently retained, and requested leave to file a post-trial motion *instanter* which was, Mr. Haddix said, "practically duplicative" of the defendant's previously filed motion for a new trial. The court denied the request, finding that the 30-day period for filing post-trial motions had expired, but informed Mr. Haddix that he was free to file a notice of appeal. As stated earlier, defendant has now appealed.

Defendant raises three issues: (1) whether the trial court properly found defendant guilty of attempted murder beyond a reasonable doubt; (2) whether the trial court properly admitted defendant's statement; and (3) whether the trial court committed reversible error when it denied defendant a hearing on the post-trial motion prepared by Mr. Haddix.

Defendant argues here that the evidence was insufficient to establish that he was guilty of attempted murder beyond a reasonable doubt because the evidence of the required intent was insufficient, and the evidence of self-defense and defense of a dwelling was sufficient to justify his actions. First, defendant claims that the State did not prove that he had the requisite intent to kill Grant since the evidence showed that he was only attempting to disarm Grant when he hit him with the pipe. Moreover, he argues that if he had truly wanted to kill Grant, he would have pulled the bicycle off Grant after Grant fell to the floor and would have continued to hit him in the head, instead of merely hitting Grant on his exposed legs.

Second, defendant claims that the evidence was sufficient to establish that he acted in self-defense since the evidence at trial affirmatively established that he reasonably believed that Grant was a threat to him. He had a reasonable belief, he argues, because he says he saw that Grant had his hand in his pocket, and, thus, he thought Grant had some type of weapon in his pocket. He also claims that he had reason to believe Grant would harm him because he knew that Grant had previously been at his apartment "assaulting his wife." In addition, defendant contends, both his testimony and his wife's established that Grant had previously threatened defendant with a gun. Consequently, he contends that the evidence clearly showed that he reasonably believed he was in imminent danger when he hit Grant. Finally, defendant asserts that there was also sufficient evidence presented to establish that he acted in defense of a dwelling. He submits that the evidence here showed that he was defending the Williamses' dwelling, which he claims was merely an extension of his own dwelling next

door, against Grant, who had invaded his home earlier that day.

The State, on the other hand, contends that the trial court properly found the defendant guilty of attempted murder beyond a reasonable doubt. The State asserts that the evidence presented was sufficient to show that defendant had the requisite intent to kill Grant and that there was insufficient evidence to establish that Grant acted in self-defense or in defense of a dwelling. The evidence of defendant's intent to kill Grant, the State says, was sufficient and established that defendant hit Grant in the head twice, and when Grant then fell to the floor, unconscious, defendant continued to wildly swing at the only exposed part of Grant's body, which was his legs. Further, defendant only stopped swinging at Grant when he was restrained by Charles and Patricia, at which time he immediately fled from the apartment.

The State also argues that there was no evidence of self-defense inasmuch as the only basis for defendant's claim that Grant threatened him was defendant's testimony that he was fearful because Grant had his hand in his pocket and that he believed Grant had a weapon in the pocket. The State claims that these statements had no evidentiary significance.

Finally, the State asserts that there was no evidence whatsoever to establish the theory of defense of a dwelling. There was no evidence that Grant's entry into the Williamses' apartment was not authorized or that Grant made an attack on the Williamses' dwelling. In fact, the State notes, the testimony established that Grant was a welcome visitor in the Williamses' home and that Grant never made any threats while he was there. Thus, the State concludes, the evidence presented was more than sufficient to support the trial court's finding that the defendant was guilty of attempted murder beyond a reasonable doubt.

■■ ■ A court of review will not disturb a trier of fact's determination of guilt unless the evidence is so unreasonable, improbable or unsatisfactory that it raises reasonable doubt as to defendant's guilt (See *People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461, 473.) However, in order to sustain a conviction on a charge of attempted murder, the State must prove that the defendant had the intent to kill the victim. (*People v. Graham* (1985), 132 Ill. App. 3d 673, 682, 477 N.E.2d 1342, 1348; see Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) Intent can seldom be proven by direct evidence and is generally inferred from circumstances that warrant the inference. (See *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 881, 522 N.E.2d 1317, 1322.) In this case, the State had to demonstrate that the defendant intended to kill Grant when he struck him. Here, the evidence showed that

defendant came into the Williamses' apartment swearing at Grant, that he rushed over to Grant, struck Grant in the head at least once, and probably twice, with a 2½-foot by 1½-inch pipe, and that when Grant lost consciousness and fell to the floor and a bicycle fell on top of him, defendant continued to swing at Grant's legs. Certainly, from this direct evidence, it was reasonable to infer that the defendant intended to kill Grant. Thus, we believe there was sufficient evidence for the trial court to conclude that the defendant was guilty of attempted murder.

■■ The defendant's second claim, that the evidence established that he acted in self-defense, is governed by statute:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another ***." (Ill. Rev. Stat. 1987, ch. 38, par. 7—1.)

A trier of fact's finding that a defendant's belief of danger was unreasonable and that a defendant's use of force was excessive will not be overturned unless it is so improbable, erroneous or unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Conwell* (1978), 64 Ill. App. 3d 995, 382 N.E.2d 64.

■■ Here, the evidence of self-defense was insufficient to raise a reasonable doubt as to defendant's guilt. Defendant's testimony did not establish that he reasonably believed he was in immediate danger of death or great bodily harm from Grant. All of the testimony at trial showed that Grant, on the day of the incident, had not physically or verbally threatened defendant (even the evidence concerning whether Grant had, on one prior occasion, threatened defendant with a gun was conflicting). Furthermore, defendant said, both in his testimony at trial, and in his statement, that he really did not believe that he was in danger from Grant, but, rather, that he was angry at Grant for fighting with his wife earlier in the day. Hence, we find that the trial court properly rejected the defendant's claim of self-defense.

■■ The defendant's contention that the evidence established that he acted in defense of a dwelling is also an issue which is governed by statute. The pertinent portion of the statute reads:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's un-

lawful entry into or attack upon a dwelling." (Ill. Rev. Stat. 1987, ch. 38, par. 7—2.) The use of force likely to cause death or great bodily harm may be justified in such a situation only if "entry is made or attempted in a violent, riotous, or tumultuous manner, and [the defendant] reasonably believes that such force is necessary to prevent an assault upon *** him or another then in the dwelling" or "reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling." Ill. Rev. Stat. 1987, ch. 38, par. 7—2.

The defendant's contention is totally meritless. There is no evidence in the record to support defendant's claim that he acted in defense of a dwelling. Earlene and Charles Williams testified that Grant was welcomed into their apartment and that Grant did not physically or verbally threaten anyone while he was there. The record is devoid of any evidence to support defendant's claim that he reasonably believed Grant unlawfully entered the Williamses' apartment or that Grant was going to attack those in the Williamses' apartment.

Defendant next argues that the statement he signed on August 8, 1986, was improperly admitted by the trial court. He claims that the statement was not voluntary. Defendant relies upon his own testimony at trial in which he stated that the assistant State's Attorney, Ms. Martin, threatened to throw him in jail if he refused to sign the statement as she had written it. Defendant asserts that on the basis of this claim, he was entitled to a hearing on the issue of voluntariness. The State, however, asserts that defendant waived review of this issue because he did not move to suppress the confession prior to trial. In any event, the State argues, the evidence showed that the statement or confession was voluntary and that defendant fully understood his rights when he signed it.

The failure to challenge the admission of a confession at trial either by a motion to suppress or by appropriate objection at trial and then by a post-trial motion generally waives appellate review of the matter. (*People v. Terrell* (1975), 62 Ill. 2d 60, 63, 338 N.E.2d 383, 384; *People v. Brownell* (1984), 123 Ill. App. 3d 307, 310, 462 N.E.2d 936, 939; *People v. Sanford* (1983), 116 Ill. App. 3d 834, 844, 452 N.E.2d 710, 715; see also *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Additionally, a defendant must normally challenge the voluntariness of a confession by a motion to suppress which, under Illinois law, must "be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." Ill. Rev. Stat. 1987, ch. 38, par. 114—12(c); see also *Terrell*, 62 Ill. 2d at 63, 338 N.E.2d at 384.

Here, the defendant made no motion to suppress the confession prior to trial, even though the statement was available to defense counsel well before trial began and the grounds for such a motion were also known. The only objection by the defense to the confession, both at trial and in his post-trial motion, was based solely on the contention that the confession was inadmissible hearsay. There is no indication in the record of any defense objection to the confession on the basis of voluntariness. Thus, we find that the defendant waived his right to review on this issue.

■ Even if this matter had not been waived, an examination of the evidence within the record shows that the statement was in fact voluntary. Detective Skol testified that he read defendant his rights and that Assistant State's Attorney Martin also read defendant his rights, the defendant himself testified that he was read his rights, and, additionally, a portion of the statement itself, signed by the defendant, clearly explained those rights. Although defendant testified at trial that Ms. Martin threatened to throw him in jail if he did not sign the statement, Detective Skol, who was also present, testified that no such threats were made. We also note that even if the confession had not been admitted, the other evidence presented at trial was more than sufficient to support defendant's conviction.

■ Defendant's final claim is that the trial court erred when it prevented his newly retained attorney from filing and arguing a second motion for a new trial at the post-trial hearing. The State, however, argues that the trial court properly denied defense counsel leave to file a second post-trial motion because, as defense counsel told the court below, it was "practically duplicative" of the original motion for a new trial on which a hearing had been held, and because, in any event, the motion was proffered after the 30-day period for filing such motions.

A written motion for a new trial in a criminal proceeding must be filed within 30 days following the entry of a finding. (Ill. Rev. Stat. 1987, ch. 38, par. 116—1.) Here, judgment was entered against the defendant on November 4, 1987, and Mr. Haddix asked for leave to file a second "practically duplicative" post-trial motion on December 9, 1987, immediately after the court had held a hearing on the first motion for a new trial. This second motion for a new trial was filed more than 30 days after judgment was entered against the defendant on the attempted murder count, and, thus, the request to file a second motion for a new trial and the request for a hearing on that motion was properly denied by the trial court. Furthermore, as defendant's counsel told the trial court, the second motion was "practically dupli-

cative" of the first motion, which had just been argued before the court.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and LaPORTA, J., concur.